[Crim. No. 23029. Mar. 3, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES ANDREW MELTON, Defendant and Appellant.

718

**COUNSEL**

Robert F. Kane, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John W. Carney and Rudolf Corona, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**EAGLESON, J.**—Defendant James Andrew Melton was convicted of one count of first degree murder (Pen. Code, §§ 187, 189[1]), one count of burglary (§ 459), and one count of robbery (§ 211). Under the 1978 death penalty initiative law, special circumstances were found true that the murder was committed in the course of a robbery (§ 190.2, subd. (a)(17)(i)) and of a burglary (*id.*, subd. (a)(17)(vii)). The jury imposed the death penalty for the murder. This appeal is automatic.

We find no prejudicial error at either the guilt or penalty phases of defendant's trial. We therefore affirm the judgment in all respects.

## I. GUILT TRIAL

*A. Prosecution case.*

On Tuesday evening, October 13, 1981, police officers found Anthony DeSousa dead in his Newport Beach condominium. DeSousa, a 77-year-old White male, was lying on his back in bed, naked, his hands bound in front of his body with an electrical cord from a portable vanity mirror. His face was covered with a pillow, and a woven mesh-type cord was tightly wound around his neck. A leather strap known as a "cock ring" was wrapped around DeSousa's penis.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

The victim had been severely beaten about the face and head shortly before his death; the beating had caused a broken canine tooth. The condition of the body suggested DeSousa had been dead for several days. The pathologist who performed the autopsy opined that the victim had been strangled to death after the beating rendered him unconscious. In the pathologist's view, whoever had inflicted the beating would have injured his hands.

DeSousa's condominium had been ransacked. Blood was spattered throughout the bedroom. DeSousa's wallet was found empty except for his driver's license. A jewelry box had been pried open. Two matching blue socks were found at separate locations in the apartment. On the dining table were two used dinner settings and two uneaten servings of pie. The premises were thoroughly dusted for fingerprints and bloodstain samples were analyzed; none matched defendant's.

On October 16, one Johnny Boyd told his parole officer that defendant was involved in the homicide. The same day, investigating officers arrested defendant near his residence as he entered DeSousa's car. Two of the victim's rings were found in his possession.

Detective Hietela interviewed defendant pursuant to a *Miranda* waiver (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) shortly after his arrest. When asked if he knew DeSousa, defendant replied that they were lovers. He said he had spent Saturday, October 10, with the victim at Disneyland and claimed DeSousa had lent him his car. Defendant asserted he had left DeSousa at 4 p.m. that day and denied having any other property of the decedent.

Defendant had been staying at the apartment of a friend, Diane H. After interviewing defendant, Hietela went to Diane's apartment and searched it with her consent. He discovered luggage, a movie projector, cameras, and several electronic items belonging to DeSousa. He also recovered two pawn tickets bearing defendant's signature. By tracing these tickets, police discovered that on October 12, defendant had pawned, then redeemed, one of DeSousa's rings found in his possession when he was arrested. Police retrieved another of DeSousa's rings which defendant had sold on October 13 to a company in the business of melting down gold jewelry and reusing the stones.

Boyd was the principal prosecution witness. In return for a grant of immunity, he testified as follows: he and defendant were fellow inmates at California Men's Colony (CMC) and had been lovers in prison. While in CMC, they conceived a plan to solicit older, affluent males who ran person-

al advertisements in the Advocate, a national gay newspaper. Attempts would be made to obtain property from the men, as gifts if possible, by force if necessary.

According to Boyd, he was released from CMC in January 1981, while defendant was still incarcerated. Boyd went to live with his parents in Pasadena. In the summer of 1981, he noticed DeSousa's ad and arranged a meeting. During a dinner at DeSousa's residence, DeSousa explained that he liked "masculine" Black men with sadomasochistic tendencies and preferred the feminine role in sex. The two therefore concluded they were not sexually compatible, but they agreed to see each other again as friends. Boyd mentioned that DeSousa might be interested in his "cousin," who was 6 feet tall, weighed 200 pounds, and had a 29-inch waist. He was referring to defendant.

Defendant was released from CMC on August 31, 1981. Boyd had expected they would live together, but defendant moved in with Diane H., then flew to New York for three weeks in response to an Advocate ad, then returned to Los Angeles on an airplane ticket purchased by Boyd. Again, defendant lived with Diane.

Upon defendant's return to Los Angeles, Boyd told him about DeSousa. He mentioned in particular two valuable rings DeSousa had worn, and the two agreed to steal DeSousa's property. Boyd arranged a dinner for the three at DeSousa's home, to take place on Thursday, October 8. Before the meeting could occur, however, Boyd was arrested on petty theft charges and detained in the Los Angeles County Jail. He and defendant agreed that the latter would rearrange a meeting with DeSousa.

Boyd called DeSousa several times Saturday, October 10, and got no answer. He formed the opinion something had happened to DeSousa.

Boyd next spoke with defendant on Sunday morning, October 11, at the jail. Defendant was wearing two of DeSousa's rings and was holding DeSousa's keys. According to defendant, DeSousa had picked him up at the Disneyland Hotel on Saturday morning, and they had returned to DeSousa's condominium. When pressed for details on what had happened to DeSousa, defendant was initially reticent. Presently he said DeSousa would not be able to tell anyone that defendant had been at his home, then finally made a distinctive strangling gesture with his hands. Boyd noticed a scar and broken skin on defendant's knuckles. Defendant said he had worn socks over his hands to eliminate fingerprints. He explained he had placed luggage and other property belonging to DeSousa in a locker at the Greyhound bus depot in downtown Los Angeles.

On cross-examination, Boyd admitted he was upset by defendant's obvious intention, upon his release from CMC, not to resume their intimate relationship. Boyd also conceded he had told a defense investigator, David Carpenter, that a man named Charles murdered DeSousa. A reference to Charles as the killer also appeared in a letter from Boyd to defendant during the latter's detention in Orange County jail. At trial, Boyd claimed he made Charles up at defendant's urging.

Diane H. testified that defendant left her apartment by bus at 10 a.m. on October 10, saying he was going to Disneyland to meet a friend who owed him money. He had around $30 with him. About 5 p.m., defendant called to suggest they find a party to attend that evening, indicating that his friend had loaned him his car for the weekend. The background noise on the telephone gave the impression defendant was calling from a bar.

Defendant arrived at Diane's apartment half an hour later driving DeSousa's car. He was carrying about $200 in cash, which he said was some, but not all, the money the friend owed. Defendant expressed his intention to keep the car if the friend did not pay the remainder, and he asked Diane how to get a pink slip in his name.

Diane said she and defendant planned a drive to Chinatown on Sunday, October 11, after he returned from visiting Boyd in jail. Just as they were leaving for Chinatown, Diane answered the telephone; someone Diane believed was Boyd asked for defendant. After hanging up the phone, defendant said they would have to stop at the bus depot to pick up some things for "John." At the depot, defendant retrieved luggage and property belonging to DeSousa which was later discovered in Diane's apartment.

Diane also testified on cross-examination that she had a conversation with Boyd shortly after defendant's arrest. Boyd said he was going to go to the "D.A." with the truth and would have defendant out of custody "in no time."

Finally, the prosecution introduced calendars and notebooks found in DeSousa's apartment and containing entries in DeSousa's handwriting. Beginning in June 1981, these referred to "John" from "Pasadena," including a description matching Boyd's. On a notebook page dated October 7, 1981, DeSousa had written "James, L.A., Six Foot, 200, 29-inch waist, 29, coming Saturday in place of John."

*B. Defense case.*

Carl Holmes, defendant's prior attorney, testified that Boyd had contacted him by telephone on October 27, 1981, to ask how the case was going.

Boyd then denied having told the police that defendant killed DeSousa. He claimed defendant had arrived at DeSousa's home to find him already dead. Holmes told Boyd an investigator would contact him; when Boyd called several weeks later trying to reach the investigator, Holmes advised that he was no longer the attorney of record.

David Carpenter, a defense investigator, testified that he spoke with Boyd on a number of occasions. Boyd asserted he had formed a plan with a man named Charles, whom he met at the Waldorf Bar, to go to DeSousa's house and "rip him off." Boyd said he had falsely accused defendant at the preliminary hearing as revenge for being "jilted." Carpenter did not attempt to locate Charles because Boyd's information, including his description of Charles, was "not of sufficient quality" to launch an investigation. Nor did Carpenter report his conversation with Boyd to any law enforcement entity. However, Carpenter urged Boyd to go to the prosecutor.

Defendant testified in his own behalf. He conceded he had participated in the prison discussions about obtaining property from Advocate advertisers, but said he was only "passing time" and never intended to carry out the plan. After his release, defendant planned to marry Diane H. and "go straight."

At some point after defendant's release, he stated, Boyd mentioned that they should steal property from DeSousa according to their prison plans, but defendant was not interested. He missed a meeting with DeSousa set up by Boyd because he did not wish to be involved in Boyd's scheme. Later, Boyd suggested DeSousa might be able to help defendant financially, or with a job. On Friday, October 9, defendant called DeSousa; they discussed "a job, a place to stay, and engaging in homosexual activities." They agreed to meet the next day. Boyd, by then in jail, encouraged defendant's plan.

According to defendant, he had agreed with DeSousa to travel by bus to the Disneyland Hotel, then to continue on to DeSousa's home by bus if DeSousa was too busy to pick him up. Defendant called DeSousa from the hotel; when DeSousa did not answer, defendant proceeded on by bus as they had arranged.

Arriving at DeSousa's residence, defendant found the front door ajar; he called out DeSousa's name and got no response. Defendant walked in out of "curiosity," saw that the living room had been ransacked, and went upstairs. There he found DeSousa dead. In a panic, defendant ran back out of the house toward the bus stop. Unable to find the stop for a bus back to Los Angeles, defendant returned to the house, picked up DeSousa's keys, which were lying on the bedroom floor, and took DeSousa's car from the garage.

He drove to the Waldorf Bar in downtown Los Angeles, where he gambled for two or three hours, then went to Diane H.'s apartment.

The next day, defendant recounted the experience to Boyd during his jail visit; the latter "kind of just smiled a bit." Boyd encouraged defendant to keep DeSousa's auto and offered to assist in obtaining a bogus pink slip in defendant's name. Defendant decided to keep the car. During the visit, defendant also agreed as a favor to Boyd that, after receiving a call from Boyd later that day, he would meet Charles at the Greyhound depot to pick up some luggage and other property of Boyd's. Defendant received the call at Diane's apartment just as he and Diane were leaving for Chinatown. He met Charles, retrieved the property, and took it back to Diane's apartment. He appropriated two rings and a watch and pawned one of the rings. He later redeemed this ring with gambling winnings and sold it because Boyd wanted "money on the books" at the jail.

Defendant admitted his inconsistent statement to Detective Hietela at the time of his arrest; he said he became "scared" when Hietela told him the police were informed he had property stolen from DeSousa's residence. Defendant concluded that Boyd was the informant and suspected for the first time that he had been "set up." According to defendant, Boyd implied in subsequent conversations that he knew the truth about DeSousa's death but would not help unless defendant "got rid" of Diane and returned to him. Defendant conceded he had tried to get Boyd to go to the authorities with his information, even agreeing at one point to resume homosexual relations with Boyd. He denied conspiring with Boyd to make up Charles as DeSousa's killer.

## II. PENALTY TRIAL

### A. *Prosecution case.*

The prosecution's penalty evidence centered entirely around prior felonies committed by defendant. (§ 190.3, subds. (b), (c).) Defendant stipulated to seven felony convictions, all entered on pleas of guilty or no contest. The convictions included (1) robbery of Bernice N. on May 19, 1971, (2) rape of Bernice, (3) robbery of Paula N. on June 14, 1971, (4) rape of Paula,[2] (5) assault with a deadly weapon against James D. on December 14, 1978, (6) concealing the stolen property of Ruben Montoya, the offense occurring on August 21, 1979, and (7) grand theft from Hoedra, Inc., the offense occurring between November 2 and November 14, 1978.

---

[2] Defendant admitted he committed the offenses against Paula while armed with a deadly weapon.

Despite the stipulation, and over defendant's objection, the prosecution introduced detailed testimony by Bernice, Paula, and James about the crimes against them. The prosecution also presented evidence of a crime of which defendant had not been convicted, the rape of Nancy S. on June 7, 1971.

Bernice, who taught nursery school in Berkeley, testified that, on a school holiday, she went with her 10-year-old son to tend the school's pets. Defendant appeared, robbed her of $3, and locked her son in a bathroom. He announced he wanted sex, menaced her, and finally struck her unconscious with a tire iron. He then forced her to have intercourse. He took her wallet containing her credit cards and driver's license. Defendant threatened to kill Bernice and her son if she screamed. The victim retained a forehead scar from the tire iron. Both she and her son remained emotionally disturbed by the incident.

Paula, a college student at the time of her encounter with defendant, found him in her apartment one evening. He took a $10 bill, threatened her with a knife and screwdriver, raped her, and then ransacked the apartment for more property.

James, an elderly Oakland man, testified he responded in 1975 to defendant's ad in a gay newspaper. He visited defendant in prison weekly, developed a love relationship, and provided defendant with gifts and money in excess of $12,000 over a three-year period. They agreed they would live together in a sexual relationship as father and adopted son. Though defendant went to live with Diane H. after his 1978 release, he continued to manipulate James for money. In December 1978, when defendant spent some time in Oakland, James gave defendant a key to his house, where defendant visited from time to time. Late one evening, defendant was in the house when James returned from work. After giving James what was apparently a drugged drink, defendant declared they were "going to play some S & M." He began slashing James's wrists with a sharp, razor-like instrument, saying, "I am going to make out that you committed suicide." He then beat James severely. When James's job foreman telephoned, James was able to signal that he was in trouble, and the police intervened. James was hospitalized for five days and off work for some five months. He suffered permanent injuries from the assault.

Nancy S. testified she was working alone one morning as a part-time secretary in a Berkeley synagogue. Defendant appeared and asked to use the phone. After doing so, he grabbed her, expressed his intention to "fuck" her, and dragged her to a recessed area at the back of the platform, near where the Ark was kept. He beat her again and again with his fists and with

a hard cylindrical object, causing her to bleed profusely. He jumped on her chest with his knees and menaced her with a six- or eight-inch knife. He attempted intercourse but was unable to achieve an erection or penetration. Defendant robbed the synagogue's petty cash box of about $5, took change from Nancy's coin holder, rummaged through her purse, and found checks with her name and address. He threatened to come and get her children if she called the police. Nancy was hospitalized and retains a permanent scar.

### B. Defense case.

Various members of defendant's family testified about his childhood and character. They indicated that defendant was an unhappy child, a "loner" who did not fit in. Raised by stepparents, he received whippings and ran away at the age of 11. He first entered the California Youth Authority (CYA or Authority) at age 13. He sought counseling in CYA but never received it. While in CYA, he maintained limited contact with family members by telephone and letters, but they rarely saw him. He shielded his family from the reasons for his subsequent prison sentence for rape. He did not discuss his own problems, was protective of his sisters, and consistently urged them to stay out of trouble. He complained about violence in prison and refused to participate in it.

Pearl West, CYA's director from 1976 to 1981, testified that defendant's CYA records had been destroyed at the time he reached majority. She generally described the depersonalized, coercive, and violent atmosphere of incarceration at CYA. West reported studies indicating that early CYA commitment increased the likelihood of subsequent criminal behavior. She explained that, after defendant's CYA incarceration, she tightened guidelines for admission to the institution and would not have authorized defendant's commitment for his then-committed offenses.

A convicted felon, David Davis, testified about the hardships of prison life. There were indications from several witnesses that defendant was a cooperative inmate who avoided violence and prison gangs.

Defendant was examined by a clinical psychologist, Dr. Podboy, and a psychiatrist, Dr. Aaron. Each opined that defendant was of low- or dull-normal intelligence and suffered from the disorder known as antisocial personality. Both suggested that defendant showed an ability to function well in a rigidly structured environment like prison, but could not control his impulses or actions in an unstructured setting. Dr. Aaron reported that defendant said he had been gang-raped frequently in CYA. Defendant also advised Dr. Aaron that he experienced extreme emotional trauma during

his first two years in prison and was placed on the antipsychotic medication Mellaril while in county jail. Dr. Aaron testified that his examination and conclusions were hampered by the destruction of defendant's CYA records.

## III. Jury Selection Issues

■ Defendant notes that the prosecution excused for cause all prospective jurors who stated they absolutely could not vote for the death penalty (see *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 521-522 [20 L.Ed.2d 776, 784-785, 88 S.Ct. 1770]), even if they asserted that their penalty views would not prevent them from judging guilt or innocence impartially. Further, he observes, the prosecution peremptorily challenged all members of the venire who expressed reservations about the death penalty. He urges that the resulting jury was unconstitutionally guilt-prone and unrepresentative of the community.

We have consistently rejected such claims (e.g., *People* v. *Chavez* (1985) 39 Cal.3d 823, 827 [218 Cal.Rptr. 49, 705 P.2d 372]; *People* v. *Fields* (1983) 35 Cal.3d 329, 374 [197 Cal.Rptr. 803, 673 P.2d 680], cert. den. (1984) 469 U.S. 862 [83 L.Ed.2d 204, 105 S.Ct. 267]; see *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 61-69 [168 Cal.Rptr. 128, 616 P.2d 1301]), and the United States Supreme Court has recently vindicated our views. (*Lockhart* v. *McCree* (1986) 476 U.S. 162, 174-176 [90 L.Ed.2d 137, 148-150, 106 S.Ct. 1758].) ■■■■ No reason appears to reconsider the issue.[3]

---

[3] In his opening brief, defendant made passing reference to the fact that, in a venire of 278 prospective jurors, only three were Black, and no Black person was chosen as a juror. One prospective Black juror, Mr. Simpson, was challenged peremptorily by the prosecutor, another was excused for medical reasons, and a third was selected as an alternate. On rehearing, defendant claims he intended an argument that the peremptory exclusion was on improper grounds of "group bias." (*People* v. *Wheeler* (1978) 22 Cal.3d 258, 276-277, 280-282 [148 Cal.Rptr. 890, 583 P.2d 748]; see *Batson* v. *Kentucky* (1986) 476 U.S. 79, 84-100 [90 L.Ed.2d 69, 79-90, 106 S.Ct. 1712].) He urges that the trial court made an "implied" finding of prima facie discrimination (see *People* v. *Turner* (1986) 42 Cal.3d 711, 719 [230 Cal.Rptr. 656, 726 P.2d 102]) when, on its own motion, it asked the prosecutor to explain "for the appellate record" why he was excluding Simpson. Defendant further contends the prosecutor's answer failed to rebut the resulting presumption of group bias. However, the record clearly indicates the court saw no potential impropriety in Simpson's exclusion, but acted only in an abundance of caution about "group bias." Its request was not an implied finding of prima facie discrimination. In any event, the prosecutor's stated reasons, which included concern about Simpson's voir dire answers suggesting *specific* racial bias (see *Wheeler, supra,* 22 Cal.3d at pp. 275-276; *People* v. *Turner* (1984) 37 Cal.3d 302, 314-315 [208 Cal.Rptr. 196, 690 P.2d 669]), are amply supported by the record.

Finally, if defendant's brief reference to the composition of the venire was intended as a claim of unconstitutional bias in the jury-pool selection procedures, it must similarly fail. Defendant never moved to quash the venire, and he made no attempt to show that the jury pool was disproportionate to the relevant community population.

## IV. GUILT PHASE AND SPECIAL CIRCUMSTANCE ISSUES

*A. Trial court's treatment of Boyd's testimony and demeanor.*

During the extensive direct examination of Johnny Boyd, the prosecutor on several occasions indicated that he was unable to hear Boyd's answers. In other instances, Boyd professed inability to remember details of his dealings with defendant and had to have his recollection refreshed by the reading of his preliminary hearing testimony.

At the conclusion of the prosecution's examination, and out of the jury's presence, the following exchange occurred: "THE COURT: Take off your glasses again, Mr. Boyd. Look over this way. [¶] I want you to understand something, Mr. Boyd. The court is not satisfied with the manner in which you have been answering the questions. If you can't keep your voice up, the court is going to require that you do so. [¶] When counsel asks questions of you, he is entitled to an answer. He is entitled to a reflection of what the truth is. And the jury is entitled to an answer that they can hear. [¶] You haven't been doing that. [¶] If you do not conduct yourself in the court's mind as an appropriate witness, the court will consider contempt action against you. [¶] Do you understand that, sir? [¶] THE WITNESS: Yes. [¶] THE COURT: Okay, let's keep your voice up."

Defense counsel then requested that this admonition be repeated in front of the jury, since Boyd's demeanor was critical to evaluation of his credibility. The trial court declined to restate the warning in full. However, it did advise the jury that, because of the "obvious" difficulty some jurors were having in hearing the witness's testimony, Boyd had been admonished "to hold his voice up so he can be heard."

Defendant now argues that the "secret" admonition was overly curt and threatening. Thus, defendant urges, it constituted improper "coaching" or intimidation of the witness which may have produced a falsely credible demeanor.

The point must be deemed waived. At trial, defendant's counsel approved the admonition, even asking that it be repeated in full in open court. He thus actively discouraged the trial court from any action which might diminish the "sting" of its comments to the witness.

■ In any event, the remarks were not improper. Defendant suggests they implied the court's belief that the witness had been lying, and were unduly harsh in warning of a possible contempt citation.

However, the court has the power and duty to ensure a fair and orderly trial proceeding. (E.g., *Cooper* v. *Superior Court* (1961) 55 Cal.2d 291, 301 [10 Cal.Rptr. 842, 359 P.2d 274]; *People* v. *Smith* (1970) 13 Cal.App.3d 897, 907 [91 Cal.Rptr. 786, 52 A.L.R.3d 875].) A trial judge should " 'see to it that all persons whomsoever, . . . indulge in no act or conduct calculated to obstruct the administration of justice.' " (*People* v. *Merkouris* (1956) 46 Cal.2d 540, 556 [297 P.2d 999], quoting *People* v. *Harris* (1920) 45 Cal.App. 547, 552-553 [188 P. 65].) While a direct accusation of perjury has been condemned (*People* v. *Steinfeld* (1940) 38 Cal.App.2d 280, 282 [101 P.2d 89]), the instant court did not confront Boyd with such a charge. Rather, it exhorted the witness to avoid the hesitant, inaudible responses borne out by the record (see *People* v. *Venegas* (1970) 10 Cal.App.3d 814, 825 [89 Cal.Rptr. 103]), and thus to behave in a manner reasonably expected of a witness. We see no impropriety.[4]

Defendant also complains of another incident which occurred while Boyd was on the stand. Defense counsel had cross-examined Boyd at length about his claim to investigator Carpenter that "Charles," not defendant, had killed DeSousa. The prosecutor sought to rehabilitate Boyd by demonstrating that, when testifying under oath, Boyd had consistently named defendant as the apparent killer and insisted that Charles was a figment of his and defendant's imagination.

In the course of redirect examination, the following occurred; "[¶] Q. [By Mr. Geary, the prosecutor]: Have you ever testified under oath somebody else killed Mr. DeSousa or that you thought somebody else other than the defendant had killed Mr. DeSousa? [¶] A. No. [¶] Q. Have you ever testified under oath differently than you have today on direct examination about the events surrounding Mr. DeSousa's death? [¶] MR. BONNER [defense counsel]: Objection. That's vague because it's so broad. [¶] THE COURT: Sustained. [¶] Q. BY MR. GEARY: Have you testified in any different manner under oath about the events surrounding Mr. DeSousa's death, different

---

[4] In his reply brief, defendant appears to shift back to his trial position—that, in evaluating Boyd's credibility, the *jury* was entitled to know the court had delivered an extremely stern admonition which might have influenced Boyd's demeanor in the direction of false credibility. There was no prejudicial error in this regard. The admonition came at the end of Boyd's direct testimony, during which the jury had ample opportunity to note any evasiveness or reluctance to answer. Though it declined to repeat the entire admonition, the court did tell the jury that Boyd had been ordered to "hold his voice up." The jury was able to observe any change in Boyd's demeanor which might have resulted from the admonition.

Defendant suggests the court erred when it declined to advise the jury it had warned Boyd to tell the "truth." The jury was entitled, defendant insists, to know the court mistrusted Boyd's testimony. But it appears any such judicial mistrust favored the prosecution, not the defense. Other comments by the court outside the jury's presence indicate the court thought Boyd, a "distraught lover," was being evasive because of his reluctance to give answers which *damaged* defendant. A rational jury could not have been misled.

than what you testified to today? [¶] MR. BONNER: Same objection. [¶] THE COURT: *Sustained.* [¶] *This record reflects some slight discrepancies in the preliminary hearing transcript versus testimony here because of what the court observes to be lack of memory.* [¶] MR. GEARY: Yes. Thank you." (Italics added.)

■ Defendant claims the court's remark improperly bolstered the credibility of the key prosecution witness. The People first respond that defendant made no timely objection, and the point must therefore be deemed waived. (Citing, inter alia, *People v. Ramos* (1982) 30 Cal.3d 553, 576 [180 Cal.Rptr. 266, 639 P.2d 908] (hereafter *Ramos I*); *People v. Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].)

As the People observe, there was no immediate objection to the court's comment. However, the record reflects that, at a bench conference just after Boyd was dismissed as a witness, the *prosecutor,* Mr. Geary, took issue with the court's remark, suggesting it unfairly minimized the importance of the discrepancies by characterizing them as "small or minor." The court replied that its statement was a proper, if not necessarily "volitional," exercise of its power to comment on the evidence (see Cal. Const., art. VI, § 10), and the court refused to admonish the jury further. According to the record, *defense counsel* then objected to the "lack of memory" language, saying it rehabilitated a witness whose inconsistent testimony might indicate lying. Defense counsel moved for a mistrial, which was denied.

The purpose of the rule requiring timely objection is to give the trial court the opportunity to cure any error, if possible, by an admonition to the jury. (*Green, supra,* 27 Cal.3d at p. 27.) Here, an objection was raised at a time when the jury could still have been told to disregard the court's comment on Boyd's testimony. The court, given a chance to consider the matter, ruled that its remark had been proper and nonprejudicial. There is no reason to hold that the issue was waived.

Defendant's argument must, however, be rejected on the merits. ■ A California trial court may comment on the evidence, including the credibility of witnesses, so long as its remarks are accurate, temperate, and "scrupulously fair." (E.g., *People v. Cook* (1983) 33 Cal.3d 400, 407-408 [189 Cal.Rptr. 159, 658 P.2d 86].) Of course, the court may not express its views on the ultimate issue of guilt or innocence or otherwise "usurp the jury's exclusive function as the arbiter of questions of fact and the credibility of witnesses". (*Id.,* at pp. 408, 412-413.) The propriety and prejudicial effect of a particular comment are judged both by its content and by the circumstances in which it was made. (*People v. Flores* (1971) 17 Cal.App.3d 579, 584-585 [95 Cal.Rptr. 138].)

 Here there was no prejudicial abuse. The court's remark was brief, mild, fair, and peripheral in context. Defense counsel had confronted Boyd with several examples of inconsistent testimony at the preliminary hearing. On certain other occasions, both prosecutor and defense counsel had resorted to the preliminary hearing transcript to refresh Boyd's recollection when he professed inability to remember particular facts. But these incidents involved relatively minor details, such as the precise times and places of various conversations which had occurred more than a year before trial. As the court suggested, Boyd never varied under oath about the basic events leading to DeSousa's death.

In context, the court's comment was apparently intended only to forestall a time-consuming reinquiry into noncrucial discrepancies already well known by the jury. The jury, of course, was also well aware that Boyd had given an entirely different story to defense investigator Carpenter, and it could evaluate his credibility with that in mind.

Finally, contrary to defendant's suggestion, the evidence of his guilt, though circumstantial, was extremely strong even without Boyd's testimony. Defendant was arrested in possession of the victim's car and jewelry; other property of the victim was found in the residence defendant shared with Diane H., and defendant had pawned still other such property. The victim's own notes indicated that he intended to receive defendant as a visitor on Saturday, October 10.

Defendant, in turn, admitted he had been at DeSousa's residence on that day, insisting that he found DeSousa already dead. But his claim of a "set-up" by Boyd and Charles was highly implausible. In particular, it strains credulity that one who had innocently come upon the brutal robbery-murder of a potential benefactor would express his "panic" and fear of involvement as defendant suggests he did. Defendant admits he stole the victim's car, proceeded to a bar to gamble, used the vehicle for an evening date with his fiancee, and decided after reflection to obtain forged title and keep the car. Defendant's inconsistent statements to Detective Hietela cast further serious doubt on his credibility. There is no reasonable probability that the court's treatment of Boyd and his testimony affected the verdict. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836-837 [299 P.2d 243].)

*B. Trial court's refusal to require Boyd to undergo chemical drug tests.*

At the end of the first day of cross-examination, defense counsel requested the court to order Boyd to undergo a blood or urine test for narcotics. Counsel noted he was not familiar with Boyd's "usual appearance," but he

pointed out that Boyd had come to court that day wearing dark glasses, "appeared to have extremely heavy eyelids," and "was slow in his responses."

The court indicated its strong belief "that [Boyd's] responses and his demeanor is [*sic*] because of the fact that he's distraught at being a witness against his former lover." The court ordered the prosecutor to have an expert investigator administer a pupillary response test to Boyd, but it declined to require any form of chemical testing.

The next day, the prosecutor reported that on the previous afternoon, an expert police investigator had administered a pupillary test to Boyd in "darkened and lighted conditions" and had checked Boyd's arms, legs, and other likely body areas for needle marks. The investigator had concluded that Boyd was not under the influence of drugs. Over defendant's renewed objection of inadequate testing, the court again expressed its view that Boyd was suffering only from "distraught lover's status." The court expressly found that Boyd had not been "under the influence of anything" during his previous day's testimony.

■ Defendant urges that the court's refusal to order chemical testing violated his confrontational rights, since it deprived him of the opportunity to develop evidence bearing on Boyd's perception, memory, and credibility. We disagree.

A witness's drug intoxication may indeed be a basis for impeaching his credibility (e.g., *People* v. *Manson* (1976) 61 Cal.App.3d 102, 137 [132 Cal.Rptr. 265]; *People* v. *Smith* (1970) 4 Cal.App.3d 403, 412 [84 Cal.Rptr. 412]); in extreme cases it may render him incompetent to testify (*Manson, supra*). Defendant must be allowed to explore fully any issue of the witness's competence or credibility by cross-examination, subject to the witness' right against self-incrimination. (See, e.g., *People* v. *St. Andrew* (1980) 101 Cal.App.3d 450, 460 [161 Cal.Rptr. 634].) But defendant has cited no case, nor have we discovered one, which suggests that a criminal accused is entitled on demand to subject a witness to a court-ordered physical intrusion or chemical test to determine whether he is under the influence of an intoxicating substance.

Numerous cases have recognized a person's right, under due process and search and seizure protections provided by both state and federal Constitutions, to be free from unwarranted bodily intrusions by agents of government. (E.g., *Schmerber* v. *California* (1966) 384 U.S. 757, 769-770 [16 L.Ed.2d 908, 919, 86 S.Ct. 1826]; *Rochin* v. *California* (1952) 342 U.S. 165, 172-174 [96 L.Ed. 183, 190-191, 72 S.Ct. 205, 25 A.L.R.2d 1396]; *People* v.

*Bracamonte* (1975) 15 Cal.3d 394, 401-403 [124 Cal.Rptr. 528, 540 P.2d 624].) In *People* v. *Scott* (1978) 21 Cal.3d 284 [145 Cal.Rptr. 876, 578 P.2d 123], this court established the test for court-ordered intrusions beneath the body's surface. It held that where a "warrant" (i.e., any prior judicial authorization) directing a bodily intrusion is sought, "the issuing authority *after finding probable cause to believe the intrusion will reveal [material] evidence, . . .* must apply an *additional* balancing test to determine whether the character of the requested search is appropriate. . . ." (Italics added.) This "additional . . . test" weighs the degree of intrusion against the likelihood and importance of recovering the evidence. (P. 293.) The necessary additional showing may be very slight where only a minimal intrusion, such as a blood test, is planned. But *Scott* makes clear that no intrusion may be ordered on a showing less than probable cause. (P. 294; see also *Bracamonte, supra,* 15 Cal.3d at p. 403.)[5]

Most cases in the area involve intrusions upon the criminal suspect himself. But it is manifest that nonparties have equal rights against unreasonable bodily searches. (E.g., *Shults* v. *Superior Court* (1980) 113 Cal.App.3d 696, 699-670 [170 Cal.Rptr. 297]; *People* v. *Browning* (1980) 108 Cal.App.3d 117, 124 [166 Cal.Rptr. 293].) A defendant's constitutional right to confront a witness does not entitle him to obtain court-ordered evidence in violation of the witness's constitutional rights against unreasonable searches and seizures.[6]

Here the record does not remotely establish probable cause to believe that Boyd was testifying under the influence of drugs. Defense counsel did not even raise the subject in his cross-examination of Boyd. While counsel expressed suspicion that Boyd's demeanor indicated drug use, the prosecutor and the trial judge, both of whom had an equal opportunity to observe, strongly disputed this conclusion. The court made clear its perception that Boyd's "heavy eyelids" and "slow responses" were due to the reluctance of a "distraught lover" to testify against the object of his affections. Nonetheless, in an abundance of caution, the court allowed Boyd to undergo an

---

[5] The United States Supreme Court recently adopted a similar "probable cause plus" balancing test. (*Winston* v. *Lee* (1985) 470 U.S. 753, 758-763 [84 L.Ed.2d 662, 667-670, 105 S.Ct. 1611].)

[6] Defendant relies heavily on *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416], where this court authorized court-ordered psychiatric examinations of complaining witnesses in sex cases under limited conditions. Implicitly recognizing the intrusion on privacy represented by such an examination, the *Ballard* court made clear that it should be ordered only where the circumstances indicated its "necessity." Such necessity, the court said, "would generally arise *only* if little or no corroboration supported the charge" (italics added), and defendant urged that mental or emotional condition had a bearing on the witness's veracity. (Pp. 176-177.) Even the limited right of examination recognized by *Ballard* has, of course, since been superseded. The Legislature overruled that case by statute in 1980. (§ 1112.)

external examination for signs of drug use and intoxication. When the result proved negative, the court reiterated its strong agreement based on personal observation. We find no error in the court's actions.[7]

### C. Admission of handwritten notebook and calendar entries.

Over defendant's objection, the trial court admitted several entries made in DeSousa's handwriting in a date-notebook found upstairs in his den, and on a calendar found downstairs. These entries made reference to "John," "John Pasadena," and "James." The dates for which they were entered corresponded generally to dates on which Boyd testified he or defendant had contact with DeSousa. The notations appeared to indicate DeSousa's intent to meet with either "John" or "James" on each of the relevant dates. DeSousa's friend, Albert Satter, testified that this was the fashion in which DeSousa typically recorded appointments with homosexual partners solicited through his Advocate ad.[8]

■ Defendant contends that the notebook and calendar entries are hearsay and were thus inadmissible to prove he appeared or was expected at the DeSousa residence on the day of the murder. The People respond that the entries were admissible for that purpose under *People* v. *Alcalde* (1944) 24 Cal.2d 177 [148 P.2d 627].

*Alcalde* held that a murder victim's statement of intent, though hearsay, was admissible to prove the intent was carried out. (Also see now Evid. Code, § 1250, subd. (a)(2).) Justice Traynor dissented, urging that the victim's statement she intended to "go out with" the defendant on the evening she was killed was being used improperly, not simply to establish her own conduct, but to prove that of the defendant.

---

[7] We reach the same conclusion insofar as the court denied a urine as well as a blood test. While the taking of a urine sample does not involve physical invasion of the body's interior, it does invoke privacy and dignitary interests protected by the due process and search and seizure clauses. It appears unnecessary to address whether urine tests might be ordered on a showing less stringent than that necessary for court-authorized blood tests; here, the "showing" made by defense counsel was clearly insufficient.

[8] Five separate notations were admitted into evidence. First, in the notebook on a page dated June 20, 1981, was written "John Pasadena, Six Foot Three Inches, 185 Pounds, 23, Negro, Wednesday" and a telephone number with a 213 area code. Second, on another page of the notebook dated September 22, 1981, was written "John Pasadena" with the same phone number. Third, on the downstairs calendar for the date of September 30, 1981, a notation read "John & Co." with "BLK" written under "Co." Fourth, on the downstairs calendar for October 10, 1981 (the apparent murder date), a notation read "John? Pasadena" with "John" lined out and "James" written underneath. Finally, on a notebook page dated October 7, 1981, was written "James, L.A., Six Foot, 200, 29-inch waist, 29, coming Saturday in place of John." October 10 was the Saturday following October 7. Defendant requested that the court rule on the admission of each notation separately; the court declined.

Defendant urges that *Alcalde* has been superseded by statute to the extent it allows use of a decedent's statements to prove the conduct of another. Even if not, defendant contends, the substantial scholarly criticism of *Alcalde* in that regard warrants overruling that decision.

We need not confront the issue. Regardless of *Alcalde*, and even if the notebook and calendar entries are true hearsay, they certainly were admissible to show the victim's *state of mind* (Evid. Code, § 1250, subd. (a)(1))— i.e., that he *knew* of "John from Pasadena" and "James," had a *link* with them before his death, and *expected* a visit from the latter on the day he died.[9] This circumstantial evidence of DeSousa's *understanding* is relevant to corroborate Boyd's claim that he befriended DeSousa and persuaded the victim to meet defendant. Defendant could have requested an instruction limiting consideration of the evidence to these matters, but he did not do so. Thus he cannot complain that the jury may have given it broader relevance.

In any event, any error in admitting the notations was harmless. Defendant urges that if they had been excluded, he might have decided not to testify and admit his presence at DeSousa's home. Even if such a theory of "prejudice" is cognizable, however, there was ample other evidence of defendant's contact with DeSousa near the time of the murder. Diane H. testified that when defendant returned from his October 10 visit with his "friend," he was driving DeSousa's car and stated the "friend" had lent it to him. Moreover, defendant, when arrested in possession of the DeSousa auto, immediately told police that he and DeSousa were lovers, and that DeSousa had let him borrow the vehicle. It is not reasonably probable that the verdict was affected by admission of the calendar and notebook entries.

*D. Admission of photographs of victim.*

Over defendant's objection, several postmortem photographs of the victim were admitted in evidence. Defendant urges that, singly and in combination, these photos had a prejudicial effect which outweighed their probative value. ■ He asserts in particular that, when ruling on admission of the pictures, the trial court made no record indicating it actually exercised its discretion under Evidence Code section 352, as is required by *People* v. *Green, supra,* 27 Cal.3d 1, at pages 24-27. (See also *People* v. *Montiel* (1985) 39 Cal.3d 910, 923-925 [218 Cal.Rptr. 572, 705 P.2d 1248].)

The record belies the assertion. The court examined the photos, held an evidentiary hearing to determine their accuracy in depicting the victim's

---

[9] Insofar as the notebook and calendar jottings did not directly declare a mental or emotional state, they are not hearsay but simply circumstantial evidence of state of mind. (*Benwell* v. *Dean* (1967) 249 Cal.App.2d 345, 351 [57 Cal.Rptr. 394].)

condition, and heard a spirited oral argument. The proposed bases for admission of the photos, and the grounds for defendant's objections, were brought out in detail. During the course of the hearing, the prosecutor agreed to withdraw People's exhibit 40, a full-face view of the victim's body.

The court then ruled: "As to photograph, photograph 40, which the People indicated they would not offer, the court finds that that photograph is, in fact, prejudicial and inflammatory in its nature, and the People shall not be allowed to renew their offer with regards to that photograph. [¶] The very nature of plaintiff's, or People's evidence always is somewhat prejudicial to the defense generally speaking, or it is not even relevant. [¶] The court finds in regards to the remaining photographs that the People have offered that their probative value outweighs any prejudicial nature of the evidence. That these photographs—the court specifically finds that the photographs are not so inflammatory in the eyes of the jury so as to unduly prejudice the defense. [¶] The photographs remaining other than photograph 40 shall be admitted." That the court did not comment in detail on the reasons for admitting each photograph does not make its ruling fatally defective.

Moreover, on the merits, the court's ruling was well within its broad discretion. (See *People* v. *Jackson* (1980) 28 Cal.3d 264, 302-303 [168 Cal.Rptr. 603, 618 P.2d 149]; *People* v. *Frierson* (1979) 25 Cal.3d 142, 171 [158 Cal.Rptr. 281, 599 P.2d 587].) The first degree murder charge was tried on an actual malice-premeditation theory as well as a theory of felony murder. Hence, the body's position and condition were relevant insofar as they suggested a wilful and deliberate killing. (Compare *People* v. *Turner* (1984) 37 Cal.3d 302, 320-321 [208 Cal.Rptr. 196, 690 P.2d 669].)

The first challenged photograph, People's exhibit 9, depicts the body as first discovered, in bed, unclothed, a pillow over the face, hands bound in front with an electric cord, and a sexual device around the penis. As the People suggest, this was important evidence for the People's theory that the victim was lulled with promises of sex and may even have consented to the binding which rendered him helpless.

The remaining challenged photos, People's exhibits 43, 44, and 45, are autopsy pictures which show the strangulation cord in place around the victim's neck, as well as other aspects of the victim's wounds. Defendant notes that he was willing to stipulate to the beating and cause of death. He points out that the photos show the body in a deteriorated condition from decomposition. Hence, he claims their prejudicial effect outweighed their probative value. Yet the jury was entitled to determine from the physical evidence whether the exceptional tightness of the strangulation cord, and

the nature of the victim's other injuries, indicated an intentional, premeditated killing.

Finally, we have examined the disputed photos; while they show at close range the unpleasant details of a brutal death by beating and strangulation, they are not so gruesome that their admission constituted a prejudicial miscarriage of justice. (Cal. Const., art. VI, § 13; see *Montiel, supra,* 39 Cal.3d at pp. 923-925.) We find no basis in the photographs for reversal of the conviction.

*E. Investigator Carpenter's testimony that he did not follow up on Boyd's information about Charles.*

Under cross-examination as a prosecution witness, Johnny Boyd disclosed that he had told the defense investigator, David Carpenter, of the possible involvement of Charles in DeSousa's killing. Boyd stated on the stand that when he spoke to Carpenter, he honestly believed another person, whose name he did not know, might have gone with defendant to DeSousa's home, but that he lied to Carpenter about Charles at defendant's request.

Later, as a defense witness, Carpenter confirmed on direct examination that he had had several conversations with Boyd about Charles. According to Carpenter, Boyd suggested that he had met Charles at the Waldorf Bar and conspired with him to "rip off" DeSousa, and that Charles was the probable killer. According to Carpenter, Boyd said he had lied at the preliminary hearing when he implicated defendant as the murderer.

During the ensuing cross-examination, the following occurred: "Q. BY MR. GEARY [the prosecutor]: Mr. Carpenter, did you make any efforts to find this person named Charles? [¶] A. No, sir. [¶] Q. You made no efforts at all? [¶] A. Other than through Johnny Boyd and the information he gave me was not of a sufficient quality to even, in my mind, to begin to look for Charles. [¶] Q. How about going to the old Waldorf Bar? [¶] A. Again the description given by Mr. Boyd was almost nil. [¶] Q. Did you go there and ask the people at the bar, the bartenders or anybody there if they knew any people named Charles? [¶] MR. BONNER [defense counsel]: Objection, it's irrelevant. [¶] THE COURT: Overruled. The answer will remain. [¶] Q. BY MR. GEARY: Did you? [¶] A. No, sir. [¶] Q. Did you contact L.A.P.D. to check if anybody that worked downtown knew any person that hung around this bar? [¶] MR. BONNER: May we approach the bench please."

Defense counsel then urged that what Carpenter "did not do" to follow up on Boyd's information was irrelevant and that inquiry into Carpenter's

investigatory efforts violated the attorney work-product privilege. After lengthy argument, the court ruled that Carpenter's response to Boyd's "Charles" story was relevant to its credibility, but that questions specifically bearing on Carpenter's investigatory activities, or lack thereof, would invade the work-product privilege.

Thereafter, the court sustained defense objections, made on work-product grounds, to questions about Carpenter's efforts to obtain assistance from law enforcement agencies in locating Charles. However, Carpenter was permitted to testify over objection that he did not *notify* the Orange County prosecutor, or any other law enforcement agency, that a third party might be involved in the DeSousa homicide (though he urged Boyd to do so). Defendant's motion for mistrial was denied.

Defendant renews his argument that this inquiry violated his attorney's work-product privilege. He also claims that, by revealing Carpenter's failure to pursue Boyd's information, the questions and answers disclosed Carpenter's inadmissible opinion that Boyd's statements about Charles were not worthy of belief.

The People first respond that the issue is waived, since objection was not made to the very first of this line of questions. As discussed above, however, defense counsel objected in time to allow the trial court to consider the issues and to admonish the jury if necessary. Under the circumstances, we do not deem the issue waived by failure to object.

■ We find no merit, however, in defendant's work-product claim. Insofar as the privilege applies to actual testimony in a criminal trial, defendant waived it when he called his investigator to impeach Boyd's trial testimony and to bolster the claim that Charles, not defendant, was DeSousa's killer. Having done so, he could not suppress, as privileged, damaging evidence which was within the scope of his direct examination. (See *United States* v. *Nobles* (1975) 422 U.S. 225, 236-240 [45 L.Ed.2d 141, 152-154, 95 S.Ct. 2160].) He could not use the privilege to preserve a false aura of veracity for his investigator's testimony. (Cf., *People* v. *Breckenridge* (1975) 52 Cal.App.3d 913, 923, fn. 2 [125 Cal.Rptr. 425].)[10]

■ On the other hand, defendant appears correct that Carpenter's testimony about his lack of response to Boyd's information was, for the most part, irrelevant and incompetent. Evidence of what Carpenter *did not*

---

[10] Indeed, after argument, the trial court cut off further inquiry into Carpenter's investigatory efforts, deeming that these *were* covered by the work-product privilege. The court, however, did not admonish the jury to disregard the questions and answers which had already been received in evidence on that subject.

*do* to follow up on Boyd's claims, had, in and of itself, no "tendency in reason" (see Evid. Code, §§ 210, 350) to establish that Charles did not exist or was not responsible for DeSousa's murder. It seems, as defendant asserts, that the principal purpose of the prosecutor's inquiry was to suggest simply that Carpenter *did not believe* Boyd. The jury was invited to agree with Carpenter's assessment. The trial court expressly accepted this theory of the prosecutor's inquiry.[11]

Lay opinion about the veracity of particular statements by another is inadmissible on that issue. As the Court of Appeal recently explained (*People* v. *Sergill* (1982) 138 Cal.App.3d 34, 39-40 [187 Cal.Rptr. 497]), the reasons are several. With limited exceptions, the fact finder, not the witnesses, must draw the ultimate inferences from the evidence. Qualified experts may express opinions on issues beyond conmon understanding (Evid. Code, §§ 702, 801, 805), but lay views on veracity do not meet the standards for admission of expert testimony. A lay witness is occasionally permitted to express an ultimate opinion based on his perception, but only where "helpful to a clear understanding of his testimony" (*id.*, § 800, subd. (b)), i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed. (*People* v. *Hurlic* (1971) 14 Cal.App.3d 122, 127 [92 Cal.Rptr. 55]; see Jefferson, Cal. Evidence Benchbook (1972) § 29.1, pp. 495-496.) Finally, a lay opinion about the veracity of particular statements does not constitute properly founded character or reputation evidence (Evid. Code, § 780, subd. (e)), nor does it bear on any of the other matters listed by statute as most commonly affecting credibility (*id.*, § 780, subds. (a)-(k)). Thus, such an opinion has no "tendency in reason" to disprove the veracity of the statements. (*Id.*, §§ 210, 350.)

The instant record does not establish that Carpenter is an expert on judging credibility, or on the truthfulness of persons who provide him with information in the course of investigations. He knew nothing of Boyd's reputation for veracity. He was able to describe his interviews with Boyd in detail, leaving the factfinder free to decide Boyd's credibility for itself, based

---

[11] Thus, the court stated: "If there is a witness on the stand that offers only impeaching evidence of a so-called star witness in a homosexual murder trial, this witness testifies contrary to the testimony of Mr. Boyd under oath, presumably because the defense would have the . . . jury believe that the witness Mr. Boyd testified falsely under oath, and there is another person, somebody named Charles, who did the murder. [¶] It's obvious to the court that when you put that concept into issue, that is the credibility factor of Mr. Boyd and you impeach Mr. Boyd in the manner of putting a witness on who did certain investigation and took certain statements that the conduct of the receiver of the information bears on the credibility of the impeaching evidence, and if you fail to turn over information to the authorities that there was, in fact, another individual, or instructed your witness not to turn over certain information, that bears on the credibility factor of the impeaching evidence, in the court's mind."

on such factors as his demeanor and motives, his background, his consistent or inconsistent statements on other occasions, and whether his statements to Carpenter had the essential "ring of truth." The trial court thus erred insofar as it admitted Carpenter's testimony to indicate his assessment of Boyd's credibility.

We see no miscarriage of justice warranting reversal, however. When all was said and done, Carpenter answered only four questions about his response to Boyd's claims about Charles. Early in his cross-examination, Carpenter conceded he did not attempt to locate Charles, but explained this was because of the *fragmentary information Boyd had given him*. Carpenter's testimony about the details, or lack thereof, in Boyd's information was entirely proper, since these were facts bearing on its credibility. Any further implication that Carpenter simply disbelieved Boyd was minimal in context.

Later, Carpenter was permitted to testify briefly that he did not notify law enforcement agencies about the possible responsibility of Charles for DeSousa's death. Carpenter added, however, that he had urged Boyd to go to the authorities with his story. These answers were somewhat more calculated to suggest that Carpenter simply did not take Boyd seriously. However, the prosecutor did not exploit that implication. His only mention of the Carpenter testimony in his closing argument was to remind the jury that "the defense investigator said we didn't *check* anywhere for Charles: *we didn't know enough about him*." (Italics added.) Again, there was no impropriety in a reference to the quality of the information Boyd had provided. In view of the extremely strong evidence of guilt, there is no reasonable probability that Carpenter's questionable testimony affected the verdict. (*Watson, supra,* 46 Cal.2d at pp. 836-837.)

*F. Failure to instruct sua sponte on lesser included offense of theft.*

The jury was instructed on the degrees of unlawful homicide, including both premeditation and felony-murder theories of first degree murder. It was further instructed on the charges of robbery and burglary, which also formed the bases for both first degree felony murder and for special circumstances rendering defendant eligible for the death penalty. Defendant was convicted of first degree murder, robbery, and burglary, and special circumstances of first degree murder in the course of a robbery (§ 190.2, subd. (a)(17)(i)) and of a burglary (*id.,* subd. (a)(17)(vii)) were found true.

Defendant now urges the trial court erred prejudicially in failing to instruct sua sponte on the crime of theft, a lesser included offense of robbery. We agree that technical error occurred but find it harmless under any applicable standard.

The principles are well established. Theft is a lesser included offense of robbery, which includes the additional element of force or fear. (*People* v. *Covington* (1934) 1 Cal.2d 316, 320-321 [34 P.2d 1019].) The court must instruct on a lesser included offense, even if not requested to do so, "when the evidence raises a question as to whether all of the elements of the charged offense are present and there is evidence that would justify a conviction of such a lesser offense." (*People* v. *Ramkeesoon* (1985) 39 Cal.3d 346, 351 [216 Cal.Rptr. 455, 702 P.2d 613]; see also *People* v. *Wickersham* (1982) 32 Cal.3d 307, 325 [185 Cal.Rptr. 436, 650 P.2d 311].)

Here the prosecution urged that defendant had killed and robbed DeSousa pursuant to a scheme with Boyd to solicit and exploit homosexual men. Defendant, on the other hand, testified that he did not kill DeSousa. He claimed he arrived innocently at DeSousa's home after the murder had occurred, and only then formed an intent to take DeSousa's property.

Though it hardly inspired confidence, defendant's testimony was substantial evidence in support of a verdict of theft rather than robbery. Defendant asserted that he had not used force or fear to deprive the victim of his property, but had stolen it after coming innocently upon DeSousa's already-dead body. The jury was empowered to believe this evidence and render its verdict accordingly. The trial court therefore erred in failing, at the outset of deliberations, to instruct sua sponte on the lesser included offense of theft.

 The error was harmless, however, even under the most stringent standard of prejudice which may apply. Insofar as a theft instruction was justified on an innocent-visitor theory, the jury necessarily resolved the issue adversely to defendant, since it found that he was DeSousa's killer. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].)

Defendant contends this finding did not conclusively resolve the question of theft versus robbery. Properly instructed, he urges, the jury could have found mere theft on a different theory of "after-formed intent." As he points out, even if one who steals from another has also assaulted his victim, the taking is theft, not robbery, if the intent to steal arose only after the assault. (*Green, supra,* 27 Cal.3d at p. 54.)

On this record, the argument must be rejected. Defendant was also convicted of *burglary,* and a burglary-murder special circumstance was found true, under instructions that the entry to DeSousa's residence must have been *for the purpose* of either *theft or robbery.* Thus, the jury necessarily determined that defendant formed the intent to steal *before* he assaulted

DeSousa. (*Sedeno, supra*, 10 Cal.3d 703.) The failure to instruct on the lesser included offense of theft caused no prejudice warranting reversal.

*G. Failure to instruct that robbery-murder and burglary-murder special circumstances required a finding of intent to kill.*

Defendant embraces the theory of *Carlos v. Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], that a felony-murder special circumstance under the 1978 death penalty initiative requires proof that defendant intended to kill. (P. 153.) In this pre-*Carlos* trial, the jury was not so advised in the instructions defining the robbery-murder and burglary-murder special circumstances. Over defense objections, however, the prosecutor obtained a separate special finding that defendant "intentionally killed a human being during the offense alleged in Count III of the information, to wit: Violation of Section 187 of the Penal Code (Murder)."

Defendant urges on several grounds that this finding was procedurally defective and did not satisfy *Carlos*. The contention is no longer relevant, however, since we have overruled *Carlos*'s holding that the 1978 death penalty law includes a blanket intent-to-kill requirement for all felony-murder special circumstances. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1138-1148 [240 Cal.Rptr. 585, 742 P.2d 1306].) ▇▇▇ Intent to kill need be charged and proved for a felony-murder special circumstance only where the defendant was an *aider and abetter* to the homicide and *not the actual killer.* (*Id.*, at p. 1147; see § 190.2, subd. (b).) Where, as here, the evidence is that defendant either personally killed or was not involved in the homicide at all, the court need not instruct on the intent-to-kill issue. (*Id.*, at pp. 1147-1148, citing *People v. Flannel* (1979) 25 Cal.3d 668, 685 [160 Cal.Rptr. 84, 603 P.2d 1].)

For similar reasons, the jury's intent-to-kill finding was not necessary to satisfy the Eighth Amendment. The United States Supreme Court has now made clear that the death penalty may constitutionally be exacted when circumstances warrant under a statute, such as ours, which limits death-eligible felony murderers to those "who *actually killed,* attempted to kill, *or* intended to kill. . . ." (*Tison v. Arizona* (1987) 481 U.S. 137, 150 [95 L.Ed.2d 127, 139, 107 S.Ct. 1676] (italics added), construing *Enmund v. Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368].) On the instant evidence and instructions, the jury's verdicts necessarily imply their finding that defendant personally killed DeSousa in the course of a robbery and burglary. The record overwhelmingly supports such a determination,

and we adopt it. ■■ ■■ ■■ ■■ Hence, defendant's culpability meets constitutional standards for imposition of the death penalty.[12]

## V. PENALTY PHASE ISSUES

### A. Failure to allow juror voir dire on effect of television movie "The Executioner's Song."

At the outset of the penalty trial, defense counsel advised the court that, on the Monday evening preceding the jury's guilt phase verdict, he had witnessed the second installment of a two-part television movie, "The Executioner's Song," which dramatized Gary Gilmore's 1977 execution by firing squad in Utah. According to counsel, the film showed Gilmore being treated as a celebrity, receiving special privileges, and hosting an alcoholic party just before the execution. ■■ In counsel's view, the movie suggested that execution was not a serious matter, and he requested the opportunity to voir dire the jurors on their responses to the show.

The trial court declined. It noted that there was nothing "festive" about the actual execution, which was depicted in grim detail. Moreover, said the court, the first installment (which counsel conceded he missed) had focused on what a "wonderful person" Gilmore was, thus emphasizing the "human aspects" of anyone facing the death penalty. The court saw no reason to

---

[12]While the jury was instructed that *Boyd* was an accomplice, and that his testimony should therefore be viewed with caution, no instructions presented a theory that *defendant* was guilty of the homicide, or of the underlying felonies, as a mere aider and abetter. As noted, the evidence suggested only that if defendant participated at all in the killing, he committed it personally. Even if the jury verdicts do not necessarily imply a finding that defendant actually killed (see *Cabana* v. *Bullock* (1986) 474 U.S. 376, 391, fn. 6 [88 L.Ed.2d 704, 720, 106 S.Ct. 689]), we may make that finding ourselves for purposes of the Eighth Amendment. (*Id.*, at pp. 386-387, 392 [88 L.Ed.2d at pp. 716-717, 720].) Our statute does not make the distinction between principal and aider and abetter an "element" of any crime or special circumstance; at most, it makes *intent to kill* an "element" of a felony-murder circumstance *if* the defendant was only an aider and abetter. (§ 190.2, subd. (b).) Thus, as already noted, an aider-and-abetter issue need not be presented to the jury at the special circumstance phase where, as here, there is no substantial evidence defendant acted in that capacity. Absent such evidence, defendant has no state-created due process right to a jury determination whether he actually killed. (*Cabana, supra,* 474 U.S. at pp. 387-388, fn. 4 [88 L.Ed.2d at p. 717, fn. 4].) Nor may defendant claim he might have presented different evidence had he known that death eligibility for a felony-murder accomplice requires a culpable mental state beyond that allowing execution of the actual killer. (Cf., *Rose* v. *Clark* (1986) 478 U.S. 570, 579, fn. 7 [92 L.Ed.2d 460, 471-472, 106 S.Ct. 3101].) As we recently observed, once the *Enmund* concerns noted in *Carlos* are dispelled, the most plausible interpretation of section 190.2 is that the enumerated special circumstances (subd. (a)) include no intent-to-kill requirement unless expressly stated therein, but that such intent is required in all cases for one "not the actual killer . . ." (subd. (b)). (*Anderson, supra,* 43 Cal.3d at pp. 1138-1148.) Thus, defendant was on notice in his pre-*Carlos* trial that the distinction between aider-and-abetter and actual-killer status might affect his eligibility for the death penalty.

believe the jury would be misled about the gravity of its responsibility. However, the court expressly admonished the jury "that if any of you observed a certain television broadcast known as 'The Executioner's Song' that dealt with the life and death of one Gary Gilmore, that you are to totally disregard that. That is not to be brought up in any way during the deliberations or mentioned to any other juror."

Defendant renews his argument that the trial court should have allowed voir dire on this subject. He urges that a sitting juror's receipt of extrajudicial information bearing on the case is misconduct, that prejudice is presumed, and that the prosecution must rebut the presumption. Denial of voir dire, he asserts, prevented him from making a record on the issues of misconduct and prejudice.

Defendant presents no juror affidavits that any member of the panel actually viewed the movie or mentioned it during deliberations on penalty. Even if we assume that one or more jurors probably saw the film, that alone does not establish misconduct. We have suggested that no misconduct occurs where "jurors [do] not deliberately set out to discover information regarding the issues at trial[, but] simply [watch] a popular television program that happen[s] to discuss the subject matter of the trial in a general way." (*Elsworth* v. *Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 557 [208 Cal.Rptr. 874, 691 P.2d 630]; see also *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 408-409 [185 Cal.Rptr. 654, 650 P.2d 1171].)[13]

Short of sequestration, of course, it is unrealistic to assume in the modern age that already-sitting jurors can be isolated from all outside information and entertainment which might conceivably affect their attitudes on the issues before them. "The Executioner's Song" made no reference whatever to defendant's case, and there is no evidence that it presented an unbalanced, inflammatory, or overly casual view of the death penalty in general. (Cf., *Elsworth, supra,* 37 Cal.3d at p. 558.) We cannot conclude that its mere appearance on television gave defendant "good cause" to voir dire and challenge the unitary guilt-penalty jury (see § 190.4, subd. (c); *Fields, supra,* 35 Cal.3d at pp. 343-353; see also p. 374 [conc. opn. of Kaus, J.]; *People* v.

[13] In *Hasson,* a products liability case against an automaker, a juror inadvertently attended a class in which a lecturer discussed another products liability case, involving a different model, against the same manufacturer. In *Elsworth,* it was alleged that two jurors had watched "60 Minutes," a weekly program which addresses a wide range of controversial issues. The segment at issue generally discussed light aircraft safety matters related to the *Elsworth* case and made a passing reference to the defendant. The jurors here might have had greater warning than in those situations that they would be confronted with issues generally related to the case before them. We did not suggest in *Elsworth,* however, that a juror must cease watching a show the moment he discovers it concerns a general subject matter which bears on his case.

*Gonzales* (1967) 66 Cal.2d 482, 498-499 [58 Cal.Rptr. 361, 426 P.2d 929]) in midtrial. Considering the remote danger of prejudice, the court's careful admonishment was ample to dispel any potential harm. No error occurred.[14]

B. *Failure to impose sanctions for destruction of defendant's CYA records.*

 Defendant's counsel advised the court at the beginning of the penalty phase that defendant's records from CYA had been destroyed. Counsel's inability to discover the records, he asserted, had hampered his ability to discover and corroborate possible mitigating circumstances arising from defendant's extensive CYA experience. Counsel requested dismissal of the death penalty or other sanctions. The motion was denied.

Pearl West, former CYA Director, testified at the penalty trial that CYA kept two files on each ward. A "master file" contained all formal commitment papers, probation reports, and correspondence about the ward's status. A second file included records of the ward's day-to-day custody. West reported that such files were routinely destroyed when a former ward attained majority. It was confirmed by stipulation that CYA's records on former wards were destroyed upon majority, and that defendant's records were thus not available. The court again denied a motion for dismissal of the death penalty or other sanctions.

Defendant renews his claim that the records were improperly destroyed to his prejudice, and that the proper sanction is to bar further proceedings seeking the death penalty. For several reasons, we cannot agree.

 Even if nonmalicious, the improper destruction of discoverable records which could lead to material evidence favorable to a criminal defendant may violate his due process rights. (*People* v. *Zamora* (1980) 28 Cal.3d 88, 96 [167 Cal.Rptr. 573, 615 P.2d 1361]; *People* v. *Hitch* (1974) 12 Cal.3d 641, 645 [117 Cal.Rptr. 9, 527 P.2d 361]; *Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531, 537-538 [113 Cal.Rptr. 897, 522 P.2d 305]; see *California* v. *Trombetta* (1984) 467 U.S. 479, 485-488 [81 L.Ed.2d 413, 420-421, 104 S.Ct. 2528]).) The constitutional duty to preserve favorable evidence, however, is not violated when the authorities have no reasonable basis to believe that the materials destroyed will have bearing on a criminal defense.

---

[14] As the People note, voir dire about "The Executioner's Song" might have presented counsel with an improper opportunity to argue the case or indoctrinate the jury. (See *People* v. *Williams* (1981) 29 Cal.3d 392, 408 [174 Cal.Rptr. 317, 628 P.2d 869]; *People* v. *Crowe* (1973) 8 Cal.3d 815, 824 [106 Cal.Rptr. 369, 506 P.2d 193].)

For federal due process purposes, the United States Supreme Court recently made this point clear in *Trombetta, supra.* There the court ruled that "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. [Fn. omitted.] To meet this standard of constitutional materiality, [citation omitted], evidence must both possess an exculpatory value *that was apparent before the evidence was destroyed,* and be of such a nature that the defendant would be unable to obtain comparable evidence by reasonably available means. . . ." (467 U.S. at pp. 488-489 [81 L.Ed.2d at p. 422], italics added.)

California decisions are consistent with the notion that the possible relevance of records or other materials to a criminal defense must have been reasonably apparent before their destruction. Thus, *Hitch* and its progeny established a duty to preserve evidence gathered *in a criminal investigation* where it might be material to guilt or innocence. (*Hitch, supra,* 12 Cal.3d at p. 652; see also, e.g., *People* v. *Nation* (1980) 26 Cal.3d 169, 176 [161 Cal.Rptr. 299, 604 P.2d 1051].)

In *Pitchess, supra,* this court concluded that where a peace officer is the alleged victim of a criminal battery, and the defendant asserts he acted in self-defense to counter excessive force, police records of prior citizen complaints of excessive force by the same officers are relevant and discoverable. (11 Cal.3d at pp. 537-539.) After *Pitchess* was filed, and without proper authority, the Los Angeles Police Department destroyed several years' records of unsustained citizen complaints against officers. *Zamora, supra,* held that sanctions were appropriate in a subsequent criminal case alleging battery upon officers whose complaint records had been destroyed. (28 Cal.3d at pp. 96-99.) This court noted in particular that, when the city attorney's office authorized destruction, it knew the records were discoverable under *Pitchess.*

In this regard, *Zamora* distinguished *People* v. *Robinson* (1978) 76 Cal.App.3d 968 [143 Cal.Rptr. 328]. There sanctions were deemed inappropriate for destruction of jail passes which might have disclosed the identity of witnesses to an alleged battery in the jail's visiting room. The *Robinson* court noted that the passes were not intended as permanent "records" and were "routinely thrown out, without any appreciation of their potential use as a lead to the discovery of testimony in a pending or anticipated case." (76 Cal.App.3d at p. 974; see also *Zamora, supra,* 28 Cal.3d at p. 98, fn. 6.)

▮▮▮ Here there was no general constitutional duty to preserve CYA records for possible relevance to future adult criminal trials. Indeed, the evidence strongly suggests defendant's files were destroyed long before

passage of the 1977 or 1978 death penalty laws. CYA officials had no reasonable ground to suspect that such records would be material to a claim of "mitigating circumstances" in a penalty trial under these statutes.

Moreover, it appears destruction of the records was statutorily authorized, and that *Zamora* sanctions are accordingly inappropriate. (See 28 Cal.3d at pp. 97-98; see also *City of Sacramento* v. *Municipal Court (Pope)* (1978) 83 Cal.App.3d 795, 798-800 [148 Cal.Rptr. 114].) In accordance with the "clean-slate" and confidentiality policies of the Juvenile Court Law, Welfare and Institutions Code section 1763 provides as follows: "The authority shall keep written records of all examinations and of the conclusions predicated thereon and of all orders concerning the disposition or treatment of every person under its control. After five years from the date on which the jurisdiction of the authority of a ward is terminated the authority may destroy such records. . . ."

Defendant first contends the files were not destroyed in strict compliance with section 1763, since destruction occurred upon his majority, less than five years after his release from CYA. However, defendant was not prejudiced thereby. If section 1763 permitted destruction of his records at all, their destruction would have been proper by the time of his penalty trial in this case.

■ More substantially, defendant claims section 1763 did not permit destruction of his *daily* files. He notes that the "records" governed by section 1763 include only records of "examinations" and "orders" concerning his disposition or treatment. These, he urges, correspond only to the "master" file, not the informal record of his daily progress.

We do not read the statute as literally as defendant suggests. "Examination" in CYA includes the day-to-day observation of his behavior; the authority has a statutory duty to keep a ward "under continued study" to evaluate his progress toward release. (Welf. & Inst. Code, § 1765.) Moreover, "orders" for his treatment necessarily include the results of day-to-day observation within the institution. We think the Legislature's intent was to permit destruction of all files generated by CYA which evaluate, govern, and record a former ward's confinement, treatment, and release.[15]

---

[15] Hence, we cannot accept defendant's argument that CYA violated the general "destruction of state records" statute, Government Code section 14755. Under subdivision (a) of that law, "[n]o record shall be destroyed or otherwise disposed of by any agency of the state, unless it is determined by the director [of the Department of General Services] that the record has no further administrative, legal, or fiscal value and the Secretary of State has determined that the record is inappropriate for preservation in the State Archives." For this purpose, "record" or "records" is defined to include "all papers, maps, exhibits, magnetic or paper tapes, photographic films and prints, punched cards, and other documents produced, re-

Later, defense counsel, Mr. Bonner, was examining a defense psychiatrist, Dr. Aaron, about the premise that one with an antisocial personality can control his impulses under close discipline but not in ordinary life. The following interchange occurred: "[¶] Q. Well, anyone is physically capable of carrying out a violent act, and if I were now to harm, shoot someone, Mr. Strople, here, if I shot him right now — [¶] THE COURT: Permission granted [¶] Q. BY MR. BONNER: — That might be justified — [¶] THE COURT: Mr. Strople is a public defender, for the record."

■ Finally, we find no prejudice to defendant from the failure to impose sanctions. Defendant urges that, in view of the guilt verdict, the jury would be suspicious of his own testimony about his dehumanizing CYA experiences; the daily files, he contends, might have provided important corroboration. However, ample credible evidence was presented from other sources which detailed the dangers and hardships, physical, emotional, and psychological, typically faced by a CYA inmate. In particular, West, a former CYA Director, testified in graphic detail on these matters. No reversible error occurred.

*C. Humorous remarks by trial judge at penalty phase.*

■ Defendant objects to two remarks made in jest by the trial judge during the penalty phase. He claims the levity was directed against the defense, suggested to the jury the court's bias, and detracted from the gravity of the issues.

In the first instance complained of, the court asked Dr. Podboy, a clinical psychologist called by the defense, if "we [can] call you John Boy for short." When the witness said yes, the court responded, "Okay. I had to do that. I'm sorry."

Later, defense counsel, Mr. Bonner, was examining a defense psychiatrist, Dr. Aaron, about the premise that one with an antisocial personality can control his impulses under close discipline but not in ordinary life. The following interchange occurred: "[¶] Q. Well, anyone is physically capable of carrying out a violent act, and if I were now to harm, shoot someone, Mr. Strople, here, if I shot him right now—[¶] THE COURT: Permission granted. [¶] Q. BY MR. BONNER:RC —THAT MIGHT BE JUSTIFIED—[¶] THE COURT: Mr. Strople is a public defender, for the record."

Counsel, of course, made no objection to the remarks. Hence, defendant has waived the issue, since a timely admonition would have cured any potential prejudice. (*People* v. *Miranda* (1987) 44 Cal.3d 57, 108, & fn. 30 [241 Cal.Rptr. 594, 744 P.2d 1127]; *Ramos I, supra,* 30 Cal.3d at p. 576; *Green, supra,* 27 Cal.3d at p. 27; see also, e.g., *Estate of Golden* (1935) 4 Cal.2d 300, 311 [48 P.2d 962]; *Germ* v. *City & County of San Francisco* (1950) 99 Cal.App.2d 404, 415 [222 P.2d 122].)

In any event, we would reject defendant's challenges. Well-conceived judicial humor can be a welcome relief during a long, tense trial. Obviously,

ceived, owned or used by an agency, regardless of physical form or characteristics." (Gov. Code, § 14741.)

however, the court should refrain from joking remarks which the jury might interpret as denigrating a particular party or his attorney. We do not condone the instant judge's references to the public defender. But the remarks were relatively brief and mild; in one case, defense counsel even joined in the joke. These isolated instances, while unfortunate, fall short of the intemperate or biased judicial conduct which warrants reversal.

*D. Admission of evidence of other criminal activity at penalty phase.*

Defendant raises several challenges to the prosecution's penalty phase evidence, which consisted solely of evidence of other criminal activity by defendant. ■ He first urges that because he offered to stipulate to his convictions for the 1971 rapes and robberies of Bernice N. and Paula N. and for assault with a deadly weapon against James D. in 1978, the prosecution should not have been allowed to introduce testimony by the victims about the details of those crimes.

We rejected an identical claim in *People* v. *Gates* (1987) 43 Cal.3d 1168, at page 1203 [240 Cal.Rptr. 666, 743 P.2d 301]. There we explained that "[w]hen dealing with violent conduct it is not the *fact* of conviction which is probative in the penalty phase, but rather the *conduct* of the defendant which gave rise to the offense. Defendant's contention might have had merit had the convictions involved *nonviolent* conduct, since the admission of such evidence is strictly limited by subdivision (c) of section 190.3. But the conviction here involved *violent* conduct and were thus admissible pursuant to subdivision (b) of section 190.3, which permits the introduction of all evidence of violent crimes and does not require a conviction. [Fn. omitted.] (See *People* v. *Balderas* [(1985)] 41 Cal.3d [144], 202-203 [222 Cal.Rptr. 184, 711 P.2d 480]." (Italics in original.)

Defendant urges that admission of testimony about the facts underlying a conviction for violent "criminal activity" improperly allows the prosecution to go beyond the "least adjudicated elements" of that offense. Admission of such evidence, he asserts, raises the risk that the capital penalty jury will prejudicially deem him guilty of a greater or different crime than that for which he was convicted.

However, subdivision (b) of section 190.3 expressly permits proof of *any* violent "criminal activity" regardless of whether it led to prosecution and conviction, except as to offenses of which defendant was acquitted. (*Balderas, supra,* 41 Cal.3d at p. 201.) No specific "elements" are at issue except that *some* violent criminal offense must exist. (*Phillips, supra,* 41 Cal.3d at p. 72; *Boyd, supra,* 38 Cal.3d at pp. 776-778.) The defendant is not being

retried (or belatedly tried) to establish that his violent criminal conduct actually included "elements" beyond those embodied in the conviction he previously suffered. (See also fn. 18, *post*.) There is no unfairness in allowing the People to show the circumstances of the violent "criminal activity."

In any event, if defendant was concerned about limiting the violent crimes the penalty jury might consider, he was entitled to request instructions on the elements of any offenses properly before it. The court was not required to give such instructions sua sponte. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 281 [221 Cal.Rptr. 794, 710 P.2d 861]; *Phillips, supra,* 41 Cal.3d at p. 68; *People* v. *Tahl* (1967) 65 Cal.2d 719, 736-738 [56 Cal.Rptr. 318, 423 P.2d 246].)

Defendant also notes that the 1971 rape and robbery convictions involving Bernice N. and Paula N., and the 1978 assault conviction involving James D., were on bargained pleas. Charges that defendant raped and robbed Nancy S. were dismissed as part of the bargain in the Bernice N.-Paula N. case. In the James D. case, defendant was originally charged with assault with intent to commit murder; the charge was reduced to assault with a deadly weapon, apparently when James expressed reluctance to testify.

Defendant urges that prior "criminal activity" which was the subject of a plea bargain should be inadmissible at a subsequent penalty trial. He suggests that admission of such offenses would subject him to "adverse sentencing consequences" beyond those agreed to at the time the bargains were entered.

The case on which he relies for this proposition, *People* v. *Harvey* (1979) 25 Cal.3d 754 [159 Cal.Rptr. 696, 602 P.2d 396], is not helpful to his cause. *Harvey* simply holds that, in imposing sentence under a plea bargain, the court may not consider evidence of any crime as to which charges were dismissed as a "circumstance in aggravation" suggesting the upper term on the remaining counts. (P. 758.) Nothing in *Harvey* implies that it would be "improper and unfair" for a capital sentencing jury to consider the circumstances of prior dismissed or bargained charges when deciding whether death is the appropriate penalty for a *subsequent* capital offense. As noted, section 190.3 prohibits evidence of other "violent criminal activity" by the defendant only if he was "prosecuted *and acquitted.*" (Italics added.) A bargained conviction or dismissal is not an "acquittal" as described in section 190.3[16]

---

[16]Defendant argues that the prosecutor improperly exploited the prior plea bargains in his closing argument by suggesting that defendant had manipulated the system to avoid serious penalties. We agree that it is misconduct for a prosecutor at the penalty phase to invite the

Were defendant's arguments accepted in full, bargained convictions would not be admissible in any subsequent prosecution to enhance the punishment for the later offense. ▪▪ ▪▪ ▪▪ ▪▪ None of the several statutes providing enhanced sentences for prior "convictions" (see, e.g., §§ 667, 667.6) suggests such a limitation.[17]

Finally, defendant mounts a specific challenge to portions of James D.'s testimony about defendant's assault against him. James, an elderly gay man, explained that he met defendant through an Advocate advertisement while the latter was in prison. James developed romantic feelings for defendant and traveled frequently from Oakland to San Luis Obispo to visit him. The

jury in any manner to draw adverse inferences from the fact that defendant entered negotiated pleas in other cases. Here, the prosecutor said, "You'll remember that the defendant did not go back to prison because of the attack on Mr. [D.]. Once again, he got a break which he did not deserve. [¶] Mr. [D.] declined to testify against the defendant at trial. Despite what the defendant had done to Mr. [D.], Mr. [D.] could not bring himself to testify at the trial. [¶] So the defendant pled guilty to a felony assault with a deadly weapon in April of 1979 and did not go back to prison." These remarks were improper for two reasons: they commented adversely on a prior plea bargain, and they focused on James D.'s unwillingness to testify, which, strictly speaking, was not relevant to the circumstances of prior "criminal activity." However, counsel made no objection. Since an admonition would have cured prejudice, the issue must be deemed waived as such. Moreover, while we can see no plausible tactical reason for failing to object, this incident, in and of itself, hardly warrants reversal on grounds of ineffective assistance of counsel.

[17] Of course, the state must accord due process, and it cannot place a person "twice . . . in jeopardy [of life and limb]" for the same offense. (U.S. Const., Amend. V; Cal. Const., art. I, § 15.) The double jeopardy and due process clauses prevent the state from (1) retrying final verdicts of guilt or innocence (including lesser included and greater inclusive offenses), (2) exacting multiple punishments for the same offense, and (3) relitigating for criminal purposes any *facts* finally resolved in defendant's favor in a prior criminal proceeding (the "collateral estoppel" rule). (*United States* v. *DiFrancesco* (1980) 449 U.S. 117, 127-128 [66 L.Ed.2d 328, 339, 101 S.Ct. 426]; *Illinois* v. *Vitale* (1980) 447 U.S. 410, 415 [65 L.Ed.2d 228, 234-235, 100 S.Ct. 2260]; *Ashe* v. *Swenson* (1970) 397 U.S. 436, 443-446 [25 L.Ed.2d 469, 475-477, 90 S.Ct. 1189].) As a necessary corollary, the state may not retry the life-versus-death issue in a capital case when, after a trial-type proceeding, the sentencer has effectively "acquitted" the defendant of the death penalty. (*Arizona* v. *Rumsey* (1984) 467 U.S. 203, 209-212 [81 L.Ed.2d 164, 170-172, 104 S.Ct. 2305]; *Bullington* v. *Missouri* (1981) 451 U.S. 430, 444-446 [68 L.Ed.2d 270, 282-283, 101 S.Ct. 1852]; but see *Poland* v. *Arizona* (1986) 476 U.S. 147, 152-157 [90 L.Ed.2d 123, 130-133, 106 S.Ct. 1749].) We conclude, however, that one is not placed "twice in jeopardy for the same offense" when the details of misconduct which has already resulted in conviction and punishment, or in dismissal pursuant to a plea bargain or for witness unavailability, are presented in a later proceeding on the separate issue of the appropriate penalty for a *subsequent* offense. (E.g., *People* v. *Johnson* (1979) 95 Cal.App.3d 352, 357-358 [157 Cal.Rptr. 150].) Such a procedure is proper, in our view, even if defendant must thereby endure the "ordeal" of a second "trial." (See, e.g., *In re Coughlin* (1976) 16 Cal.3d 52, 60-61 [127 Cal.Rptr. 337, 545 P.2d 249] [probation revocation following criminal acquittal].) The capital sentencing jury must have the most detailed relevant information about the individual offender. It would be anomalous if jurors could hear the "gory details" of prior violent crimes with which defendant *had never been charged,* but could consider only cold abstracts of conviction in cases where defendant had been prosecuted successfully. Even if the "collateral estoppel" rule applies, defendant here points to no specific facts litigated in his penalty trial which were necessarily resolved in his favor in prior criminal proceedings.

two made plans that, after his release, defendant would live in Oakland with James as his adopted son. Defendant did not do so, but went to Los Angeles to be with his fiancee, Diane H.

During a three-year period both before and after his release, defendant solicited and received various gifts and sums of money from James D. The value of these items totalled around $12,000, and the evidence suggested some had been obtained under false pretenses. James was a postal worker and a man of modest means.

Defendant finally came to Oakland for an extended visit, and James gave him a key to his house. Defendant had used the key to enter the house on the night of the assault.

 Defendant urges that the sordid events leading up to the assault itself were irrelevant to any specific "aggravating circumstance" listed in the statute. In particular, he suggests, evidence of prior *nonviolent* crimes against James was inadmissible because there was no indication defendant had suffered felony convictions for such offenses. (§ 190.3, subd. (c).)

Defendant failed to object to any of this evidence. In any event, its admission was proper. The People were entitled to show that the assault was particularly vicious and callous, since it was committed against a vulnerable victim who had shown defendant great kindness over a long period. Violent "criminal activity" presented in aggravation may be shown in context, so that the jury has full opportunity, in deciding the appropriate penalty, to determine its seriousness. We find no error in the admission of James' testimony.[18]

*E. Failure to instruct sua sponte that no adverse inference should be drawn from defendant's failure to testify at penalty phase.*

As defendant notes, the Fifth Amendment privilege against self-incrimination applies at the penalty as well as the guilt phase. (*Estelle* v. *Smith* (1981) 451 U.S. 454, 462-463 [68 L.Ed.2d 359, 368-369, 101 S.Ct. 1866].) Hence, he urges, a defendant may not be penalized for his decision not to testify at the penalty phase (see *Griffin* v. *California* (1965) 380 U.S. 609, 613-614 [14 L.Ed.2d 106, 109, 85 S.Ct. 1229]), and the court must therefore instruct the penalty jury sua sponte that it should not draw adverse inferences from his failure to take the stand. Otherwise, he suggests, the jury

---

[18] For similar reasons, we reject defendant's argument that the trial court erred in admitting testimony that the rape and robbery of Bernice N. occurred in a child care center, with the victim's son present, and that the rape and robbery of Nancy S. occurred in a synagogue.

may conclude that a mute defendant, especially one who did testify at the guilt phase, lacks remorse for his crime.

■ The well-established California rule is that instructions warning against adverse inferences from a defendant's silence need only be given upon his request. (*People* v. *Gardner* (1969) 71 Cal.2d 843, 854 [79 Cal.Rptr. 743, 457 P.2d 575].) After considering intervening United States Supreme Court decisions, we recently affirmed *Gardner's* application at the penalty phase of a capital trial. (*Gates, supra,* 43 Cal.3d at pp. 1208-1209; see also *Miranda, supra,* 44 Cal.3d at p. 107.) Accordingly, we conclude the trial court breached no duty by failing to give such an instruction in the absence of a defense request.

*F. Failure to reinstruct jury at penalty phase as to principles generally affecting its deliberations.*

■ Defendant urges he was prejudiced by the court's failure to repeat, sua sponte, at the penalty phase all the instructions given at the guilt phase concerning the principles generally applicable to jury deliberations. In particular, he suggests, the absence of such instructions left the jury without any framework for assessing the credibility of witnesses on the issue of penalty and allowed "arbitrary and capricous" penalty deliberations.

The claim is specious. The penalty jury was expressly told that, in determining sentence, it should "consider all of the evidence which has been received during any part of this trial except as you may be hereafter instructed." (CALJIC No. 8.84.1.) It was provided with the list of aggravating and mitigating factors relevant to the penalty determination (*ibid.*) and cautioned not to consider any unlisted aggravating factor. Though neither the statute nor court decisions so require, it was advised that any fact relied on for aggravation of sentence must be proved beyond a reasonable doubt, and reasonable doubt was defined. (See CALJIC No. 2.90 (1979 rev.).) The jury was further instructed on the principles of expert testimony and stipulations, and it was admonished not to take any cues from the judge. There is no realistic possibility that jurors were misled about how to evaluate the testimony of penalty phase witnesses, or that the absence of general instructions at the penalty phase induced arbitrary and capricious deliberations.

*G. Effect on penalty phase of guilt phase instructions to "ignore consequences" and disregard sympathy or pity; failure to give "expanded factor (k)" or "pro-sympathy" instructions at penalty phase.*

At the guilt phase, the court gave CALJIC No. 1.00 (1979 revision) in its entirety. Among other things, this instruction cautions the jury "not [to] be

influenced by pity for a defendant or by prejudice against him"; it further tells jurors "not [to] be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling," and admonishes that both parties have the right to expect "a just verdict regardless of what consequences of such verdict may be."

The instruction to ignore sympathy, pity, and consequences was not repeated at the penalty phase. Nor was it expressly countermanded. Defendant urges that insofar as the penalty jurors assumed they were to rely on guilt phase instructions, he was prejudiced on the issue of sentence.

We previously reversed several death judgments where (1) a "no-sympathy" instruction was given *at the penalty phase,* (2) the jury also received, without elaboration, an instruction (the unadorned factor (k) instruction) to consider mitigating evidence which "extenuates the *gravity of the [capital] crime*" (§ 190.3, subd. (k); former § 190.3, subd. (j); CALJIC, former No. 8.84.1, subd. (k), italics added), and (3) defendant introduced substantial evidence about his *general character and background.* In such cases, we reasoned, there was intolerable ambiguity about whether the jury understood its power and duty under the Eighth Amendment to consider *all* "sympathetic" evidence defendant proffered on behalf of a penalty less than death. (E.g., *People* v. *Brown* (1985) 40 Cal.3d 512, 537-538 [230 Cal.Rptr. 834, 726 P.2d 516]; *People* v. *Lanphear* (1984) 36 Cal.3d 163, 166-169 [203 Cal.Rptr. 122, 680 P.2d 1081]; *People* v. *Easley* (1983) 34 Cal.3d 858, 878-879 [196 Cal.Rptr. 309, 671 P.2d 813]; see *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 117 [71 L.Ed.2d 1, 12, 102 S.Ct. 869], and conc. opn. of O'Connor, J., at p. 119.)[19]

The United States Supreme Court granted certiorari in *People* v. *Brown, supra,* 40 Cal.3d 512, to consider the constitutional effect of a "no-sympathy" admonition on penalty deliberations in a capital case. The court has concluded that a warning to ignore "mere" sympathy does not offend the Eighth Amendment in and of itself.[20] However, where the jury was cautioned against sympathy and also received an unadorned factor (k) instruction, the penalty phase instructions and arguments must be examined as a whole to determine whether the jury was "adequately informed . . . of its responsibility to consider all of the mitigating evidence

---

[19] CALJIC No. 8.84.1 has since been revised to make clear, as we directed in *Easley,* that mitigating evidence to be considered under "factor (k)" includes "any . . . 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.'. . ." (P. 878, fn. 10; see CALJIC No. 8.84.1, subd. (k) (4th ed. 1984 rev.).)

[20] By the same token, insofar as an instruction to ignore "consequences" might be interpreted by a sentencer "in the same light as an admonition to disregard sympathy" (*People* v. *Brown, supra,* 40 Cal.3d at p. 537, fn. 7), the Constitution does not forbid it.

introduced by the [defendant] . . . ." (*California* v. *Brown* (1987) 479 U.S. 538, 546 [93 L.Ed.2d 934, 943, 107 S.Ct. 837] [conc. opn. of O'Connor, J.].)

█ Performing such an analysis here, we conclude that the jury was adequately informed. The jury did receive an instruction in the literal terms of factor (k). However, it also heard that a mitigating circumstance is one which, though it does not excuse or justify the capital crime, may be considered "in *fairness and mercy* . . . as extenuating or reducing the degree of moral culpability." (Italics added.) Moreover, the trial court gave the following special penalty instruction requested by defendant: "Mitigating factors are unlimited. Anything mitigating should be considered. [¶] Mitigating factors provided in the instructions are merely examples of some of the factors you may take into account in deciding not to impose a death sentence."

Finally, because the no-sympathy and ignore-consequences instructions of which defendant complains occurred only at the *guilt* phase, their effect on penalty deliberations must be deemed attenuated. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 785 [230 Cal.Rptr. 667, 726 P.2d 113].) Under all the instructions, the jury must surely have understood it could weigh any general mitigating evidence presented by defendant's expert witnesses and members of his family.

Moreover, the prosecutor made no effort in argument to exploit any potential ambiguity. While urging that defendant's mitigating evidence was insufficient to tip the balance against death, the prosecutor never suggested it was legally irrelevant to the penalty determination.[21] Defense counsel argued at length, without objection, that defendant's difficult childhood and history of incarceration had rendered him emotionally dead, making revenge meaningless. We conclude the instructions and argument adequately advised the jury of the scope of constitutionally relevant mitigating evidence.[22]

---

[21] In contrast with *Rodriguez,* the prosecutor did not affirmatively reinforce the principle that "all mitigating evidence is relevant." Employing a familiar technique, he ran down the list of statutory aggravating and mitigating factors, arguing the evidence bearing on each. When he reached factor (k), he did refer to the "extenuates the gravity of the crime" language of the statute and instruction, but he did not urge this excluded mitigating evidence which was *not* directly related to the capital offense.

[22] Moreover, in light of the court's instructions that mitigating circumstances were "unlimited" and that those listed in the instructions were only "examples," we reject defendant's contention that the jury was improperly permitted to consider his disturbed mental state only if the disturbance was "extreme," as set forth in subdivision (d) of section 190.3 and former CALJIC No. 8.84.1.

*H. "Mandatory" feature of the 1978 sentencing law; failure to instruct that death must be found proper "beyond reasonable doubt."*

 Defendant attacks the instruction at his penalty trial that the jury "shall" impose the death penalty if it finds that aggravating circumstances "outweigh" mitigating. (CALJIC, former No. 8.84.2; see § 190.3.) A death judgment is invalid under the Eighth Amendment if imposed by a sentencer that believed it lacked the ultimate moral responsibility to determine the appropriate penalty under all the individual circumstances. (*Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 328-329 [86 L.Ed.2d 231, 239, 105 S.Ct. 2633]; *People* v. *Brown, supra,* 40 Cal.3d at pp. 540-544.)

The "shall/outweigh" instruction, given without further explanation in some pre-*Brown* 1978-law cases, leaves room for misunderstanding in this regard. If not explained, it could be construed to mean that the "weighing" process (1) is mechanical rather than normative and, (2) once completed, automatically determines the penalty regardless of the jurors' views on appropriateness. (*People* v. *Myers* (1987) 43 Cal.3d 250, 274-275 [233 Cal.Rptr. 264, 729 P.2d 698]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1276-1277 [232 Cal.Rptr. 849, 729 P.2d 115].) We examine the instructions and argument in each such case to determine whether, overall, the jury was adequately informed of the nature of its sentencing responsibility. (*People* v. *Brown, supra,* 40 Cal.3d at p. 544, fn. 17.)

Our examination here indicates the jury must have understood its role. While it heard a "shall/outweigh" instruction, it also received additional special instructions requested by defendant. First, as already noted, it learned that aggravating factors were strictly limited by statute and must be proved beyond a reasonable doubt, while mitigating factors were "unlimited" and could be established by mere substantial evidence. The jury was also told (1) that it could assign whatever weight it deemed appropriate to each factor, (2) that a single mitigating factor could justify life rather than death if the jury found it "outweigh[ed]" all aggravating factors, (3) that relative weight, not relative numbers, was crucial, and (4) that mere counting of aggravating and mitigating factors was improper.[23]

---

[23] The special instructions provided: "You are entitled to assign whatever weight you feel appropriate to each factor. [¶] Any mitigating factor standing alone may be sufficient to justify a sentence of life without possibility of parole *if you find that the weight of such a single mitigating factor outweighs the weight of all aggravating factors.* [¶] It is the combined weight of the factors, not their number which is determinative. You are not merely to count the number of factors on each side. . . ." (Italics added.) Contrary to defendant's suggestion, the court did not create prejudicial error by adding the italicized phrase to defendant's proposed instruction. The obvious purpose and effect is to suggest, properly, that under the 1978

Furthermore, unlike the prosecutor's argument in *Myers,* the instant prosecutor's remarks, viewed as a whole, did not convey the impression that the jurors' personal views about the "appropriate" penalty under the individual circumstances were irrelevant. Nor did he press a contention that the jury was required by law to impose the death penalty, despite its reservations about appropriateness, if it found that aggravation outweighed mitigation. The prosecutor did resort to a scale motif and did tell the jury at one point that "[y]ou just balance them [i.e., the aggravating and mitigating circumstances] and those scales will tell it." However, he made clear from the outset that the jury's job was to see that "the punishment shall fit the crime." In deciding what weights to assign to the individual factors, he noted, the jurors should consider "what things you think are most important *in judging what is appropriate in this case.*" (Italics added.)

After listing the various statutory factors and arguing their relative weights, the prosecutor concluded his argument by urging: "[W]e have to let these people know that when they strike against society, when they brutalize their fellow man, severe punishment will follow. That's the order of civilized society." He suggested that "if the aggravation in this case is not sufficient to warrant the imposition of the death penalty, then we have no death penalty." Yet he cautioned that "I do not ask you to do this [i.e., vote for the death penalty] lightly." The overall thrust of his argument was that death was the "appropriate and just punishment" for defendant's crimes and that it was the jury's solemn responsibility so to decide.[24] Defendant's counsel urged that all capital cases are aggravated, but that revenge was useless and mercy was justified in light of defendant's difficult background. Under all these circumstances, we are convinced the jury was adequately informed about the scope of its sentencing responsibility.

■■■ Defendant also claims the penalty jury must specifically be told that the death penalty cannot be imposed unless found appropriate beyond a reasonable doubt. We have rejected the identical challenge in two 1977-law cases (*Jackson, supra,* 28 Cal.3d at pp. 315-318 [plur. opn.], 318-319 [conc. opn. of Newman, J.], cert. den. (1981) 450 U.S. 1035 [68 L.Ed.2d 232, 101 S.Ct. 1750]; *Frierson, supra,* 25 Cal.3d at pp. 176-184 [plur. opn.],

---

sentencing scheme, the jury may not *disregard* the *aggravating* circumstances in determining the appropriate penalty. (See *People* v. *Brown, supra,* 40 Cal.3d at pp. 544-545, & fn. 15.)

[24] The prosecutor did say near the conclusion of his argument that "[t]*he people of this state* have determined that for this crime and where you have this amount of aggravation that the appropriate and just punishment is the death penalty." (Italics added.) In context, the jury could not reasonably construe this remark as an implication that the ultimate responsibility for determining the appropriate penalty lay with the "people" or the death penalty law, rather than with the jury itself. It merely suggested that after fair deliberation on the factors deemed relevant by the state to the determination of penalty, the jury could only conclude that death was the appropriate sentence.

195-196 [conc. opn. of Mosk, J.]), and more recently as to the 1978 law (*Rodriguez, supra,* 42 Cal.3d at pp. 777-779).

*I. "Double-counting" of circumstances of charged crime as aggravating factors under both subdivisions (a) and (b) of section 190.3, and of "prior felony convictions" for violent crimes as aggravating factors under both subdivisions (b) and (c).*

As defendant notes, among other factors the jury is to consider in aggravation or mitigation under section 190.3 are "(a) [t]he circumstances of the crime for which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . ."; "(b) [t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence," and "(c) [t]he presence or absence of any prior felony conviction. . . ." Defendant urges that, literally construed, this language allows the jury to count the violent circumstances of the current crime as aggravating factors under *both* subdivisions (a) and (b).

We agree that the term "criminal activity [involving] force or violence" as used in subdivision (b) is limited to conduct other than the immediate circumstances for which the death penalty is being contemplated. (*Miranda, supra,* 44 Cal.3d at pp. 105-106.) Instructions in future cases should explain that the violent crimes described in subdivision (b) do not include the circumstances of the capital offense itself. (*Id.,* at p. 106, fn. 28; cf., *Rodriguez, supra,* 42 Cal.3d at p. 787.)

However, we think any ambiguity in the language of the statute or current instructions will rarely have caused prejudice. Absent improper argument, jurors are unlikely to give the circumstances of the current crime greater weight in the penalty determination simply because they appear to be included in two separate categories of statutory "aggravation."

Here the prosecutor did not exploit any ambiguity; he ameliorated it. As is common practice, he structured his argument by discussing each statutory "aggravating circumstance" in turn. Starting with "factor A," he reviewed the guilt phase evidence about the burglary, robbery, and murder of Anthony DeSousa. At the conclusion of these remarks, he "check[ed] off 'A' as an aggravating factor" and turned his attention to the next factor. This factor, "B," he said, "deals with *past* violence." (Italics added.) He then began his commentary about defendant's "past" violent crimes, introduced at the penalty phase. Under these circumstances, there is no realistic possibility that the jury was confused about the mutual exclusivity of subdivisions (a) and (b).

 Defendant next contends that a similar improper "overlap" and "inflation" occur when penalty phase evidence that defendant suffered prior felony convictions for violent crimes is allowed to be considered as *two* aggravating factors, once under subdivision (b) (violent criminal activity) and again under subdivision (c) (prior felony convictions). We disagree.

Among other things, section 190.3 allows presentation of evidence at the penalty phase of "any prior felony conviction or convictions *whether or not* [they] involved a crime of violence" (italics added) *and* of "*other* criminal activity" involving force or violence. (Italics added.) "Criminal activity" as used by the section "does not require a conviction." The inference is that violent "criminal activity" is admissible *whether or not* it resulted in a felony conviction. (*Balderas, supra,* 41 Cal.3d at p. 201.)

If violent "criminal activity" by the defendant *did* also result in a "prior felony conviction," there seems no statutory reason why the prosecutor must elect between subdivisions (b) and (c) when presenting the incident for purposes of aggravation. As we explained in *Balderas,* "subdivisions (b) and (c) of section 190.3 have separate purposes. Subdivision (b) allows in *all* evidence of violent criminality to show defendant's propensity for violence. Subdivision (c) allows in 'prior' nonviolent[25] felony 'convictions' to show that the capital offense was the *culmination* of *habitual criminality*—that it was undeterred by the community's previous *criminal sanctions*. [Fn. omitted.]" (41 Cal.3d at p. 202, last italics added.)

These entirely distinct and equally relevant considerations *coexist* in a prior felony conviction which also involved a violent crime. The jury is therefore entitled to evaluate such an incident for its relevance under both subdivision (b) and subdivision (c). Nothing in the statute suggests that a prior violent felony conviction may be presented in aggravation only under one or the other of the subdivisions.

For similar reasons, we are persuaded that such dual consideration of a violent "criminal activity" which led to a "prior felony conviction" does not raise constitutional concerns about artificial inflation of aggravating circumstances as discussed in *Harris, supra,* 36 Cal.3d at page 64. We agree that an individual criminal act cannot be counted twice in aggravation *for the same purpose.* However, we see no constitutional obstacle to separate consideration of properly distinct aspects of the penalty determination, even when

---

[25]This use of the word "nonviolent" in *Balderas* was intended only as a shorthand way to distinguish the felony*conviction* language in section 190.3 from *violent* "criminal activity," which "does not require a conviction." As noted, the statute expressly allows prior felony convictions to be considered "whether or not" they involved violent crimes.

those aspects happen to coexist in a single incident. We reject defendant's contention.[26]

*J. "Double-counting" of burglary-murder and robbery-murder special circumstances as aggravating factors at criminal penalty phase.*

Subdivision (a) of section 190.3 lists as an aggravating circumstance at the penalty phase "the existence of any special circumstances found to be true" at the guilt trial. At defendant's guilt trial, the jury found as separate special circumstances that DeSousa's murder occurred in the course of a robbery (§ 190.2, subd. (a)(17)(i)) and a burglary (*id.*, subd. (a)(17)(vii)). ▓▓▓▓ Defendant urges that, since the robbery and burglary arose from "indivisible" criminal conduct with a single criminal intent, the robbery and burglary special circumstances could not *each* be considered a distinct aggravating factor at the penalty phase under section 190.3, subdivision (a).

As the People concede, defendant's contention finds support in the plurality opinion in *Harris, supra.* The *Harris* plurality reasoned that where the defendant has committed a burglary and a murder to facilitate the same robbery, "the robbery and burglary special circumstances are necessarily overlapping because they describe virtually the same conduct. The use in the penalty phase of both these special circumstance allegations thus artificially inflates the particular circumstances of the crime and strays from the [United States Supreme Court's] mandate that the state 'tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.' (*Godfrey* v. *Georgia* (1980) 446 U.S. 420, at p. 428 [64 L.Ed.2d 398, at p. 406, 100 S.Ct. 1759].) The [high court] requires that the capital-sentencing procedure must be one that 'guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death.' (*Jurek* v. *Texas* (1976) 428 U.S. 262, at pp. 273-274 [49 L.Ed.2d 929, at p.

---

[26] The issue here is distinct from that addressed in *Harris.* There a plurality concluded that, when a single murder involves more than one other felony, all committed in a "single course of conduct" and with the "same criminal intent," any resulting *multiple* felony-murder special circumstances (see § 190.2, subd. (a)) may be counted *only once* in aggravation at the penalty phase as a "special [circumstance] found to be true." (See § 190.3, subd. (a).) The *Harris* plurality argued that separate consideration at the penalty phase of each of the multiple special circumstances in such a case would artificially inflate the aggravating factors by double-counting "[a single] aspect of the defendant's crime" and would constitute a form of multiple punishment analogous to that prohibited by section 654. (36 Cal.3d at pp. 62-67.) We find the *Harris* plurality's reasoning too broad (see discussion, *post*), but we doubt it applies here in any event. When two *separate penalty issues*—violence on the one hand, and felony recidivism on the other—are presented by a single incident, separate consideration of each interest cannot be deemed "artificial" or "inflated."

939, 96 S.Ct. 2950].) That requirement is not met in a system where the jury considers the same act or an indivisible course of conduct to be more than one special circumstance." (36 Cal.3d at p. 63.)

Moreover, the plurality suggested, separate consideration of each such "overlapping" special circumstance at the penalty phase would violate "[t]he principles underlying California's prohibition of double punishment. . . ." (*Id.*, at p. 64.) Under section 654,[27] a defendant may be sentenced for only one of a series of offenses arising out of an "indivisible" course of criminal conduct with a single criminal objective. (*People* v. *Beamon* (1973) 8 Cal.3d 625, 637-639 [105 Cal.Rptr. 681, 504 P.2d 905].) Thus, the *Harris* plurality concluded, section 654 is violated in a capital case if the jury may give independent aggravating weight at the penalty phase to each individual offense arising from such an "indivisible" course of conduct. (*Harris, supra,* 36 Cal.3d at pp. 64-65.)

Insofar as the *Harris* plurality was suggesting that the penalty jury may not consider, *in any form,* the existence of *more than one felony* leading to the capital murder, we find its reasoning unpersuasive. Section 190.3, subdivision (a), directs the jury to consider generally "the circumstances" of the capital crime. Even if the additional phrase "and the existence of any special circumstances [previously] found to be true" was missing, the sentencing jury would be statutorily entitled to evaluate *all the conduct* which led to the capital conviction.

Indeed, the *Harris* plurality conceded "the obvious propriety of the penalty jury considering the circumstances of the murder (i.e., that it occurred in the course of a burglary, robbery, kidnaping, etc.; that it involved torture; that the victim was poisoned, and so on), . . ." (36 Cal.3d at p. 61.) There seems no statutory impediment to the penalty jurors' general consideration of the facts that a robber-murderer (see § 190.2, subd. (a)(17)(i)) *also committed a burglary* to gain access to the victim (*id.*, see subd. (a)(17)(vii)), or that the victim was murdered by poison (*id.*, see subd. (a)(19)) after the killer had lain in wait (*id.*, see subd. (a)(15)). That would be so even if none of these facts had been alleged and proved as "special circumstances."

Nor does such consideration raise constitutional problems. ▮ Recent United States Supreme Court decisions make clear that a capital sentencing scheme properly channels and focuses the sentencer's discretion, thus avoiding the Eighth Amendment's prohibition of arbitrary and

---

[27] Section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omissior under any other."

capricious death judgments, if it (1) provides a "principled" means of distinguishing between murderers who are and are not candidates for the death penalty and (2) assures individualized consideration of the particular offense and offender before a death sentence is imposed. (See *Pulley* v. *Harris* (1984) 465 U.S. 37, 53-54 [79 L.Ed.2d 29, 42-45, 104 S.Ct. 871]; *California* v. *Ramos* (1983) 463 U.S. 992, 1008 [77 L.Ed.2d 1171, 1185, 103 S.Ct. 3446]; *Zant* v. *Stephens* (1983) 462 U.S. 862, 876-880 [77 L.Ed.2d 235, 249-252, 103 S.Ct. 2733].)

Of course, a death sentence must serve the legitimate state goals of retribution or deterrence. Thus, it "must be tailored to [the defendant's] personal responsibility and moral guilt." (*Enmund, supra,* 458 U.S. at p. 801 [73 L.Ed.2d at p. 1154].) However, once an offender has been found death-eligible by constitutionally permissible standards, the state has broad discretion to identify those relevant aspects of the defendant's criminal conduct, history, and character to which it particularly wishes to draw the sentencer's attention. (See *Pulley, supra,* 465 U.S. at p. 53 [79 L.Ed.2d at p. 42]; *Gregg* v. *Georgia* (1976) 428 U.S. 153, 192 [49 L.Ed.2d 859, 885, 96 S.Ct. 2909] [plur. opn.].)

 In our view, it is constitutionally legitimate for the state to determine that a death-eligible murderer is more culpable, and thus more deserving of death, if he not only robbed the victim but committed an additional and separate felonious act, burglary, in order to facilitate the robbery and murder. Robbery involves an assaultive invasion of personal integrity; burglary a separate invasion of the sanctity of the home. Society may deem the violation of each of these distinct interests separately relevant to the seriousness of a capital crime.[28]

Moreover, the 1977 and 1978 death penalty laws employ principles manifestly at odds with the sentencing rules derived from section 654. For example, where a burglary or a murder is committed to facilitate a robbery, section 654 prevents multiple separate terms under separate statutes for each such "indivisible" offense. (E.g., *People* v. *Smith* (1985) 163 Cal.App.3d 908 912 [210 Cal.Rptr. 43]; *People* v. *Lowe* (1975) 45 Cal.App.3d 792, 795 [119 Cal.Rptr. 699].) On the other hand, the death

---

[28] The *Harris* plurality cited three cases from other states to support the proposition that "overlapping" special circumstance allegations cannot be charged or considered on the issue of penalty. In none, however, did the "overlapping" circumstances at issue focus on separate culpable *acts* of the defendant; they simply restated in different language the single criminal objective from which the murder arose. (E.g., *State* v. *Goodman* (1979) 298 N.C. 1 [257 S.E.2d 569, 587] [murder during flight from police; special circumstances alleged as "avoiding or preventing lawful arrest" and "hinder[ing] or disrupt[ing] . . . enforcement of laws"]; *Cook* v. *State* (Ala. 1978) 369 So.2d 1251, 1256 [robbery-murder and murder for pecuniary gain]; *Provence* v. *State* (Fla. 1976) 337 So.2d 783, 786 [same].)

penalty statutes provide an integrated scheme of "special circumstances" in which the single appropriate punishment for the most serious offense—a first degree murder—is *expressly influenced* by just such "indivisible" acts and offenses. These "special circumstances" render a first degree murderer eligible for death or life without parole, and their "existence," as well as all the "circumstances" of the capital crime, must be taken into account under section 190.3, subdivision (a), when the actual penalty is chosen.[29]

Section 654, of course, does not obviate the entire "special circumstances" scheme of the death penalty statutes. To the extent they diverge, section 190.3, the more specific, must prevail over section 654. (See *Rose* v. *State of California* (1942) 19 Cal.2d 713, 723-724 [123 P.2d 505].) Despite section 654, section 190.3 obviously allows the penalty for a first degree murder to be enhanced by reference to other "indivisible" offenses. No reason then appears why section 654 requires all such other offenses to be considered *as but one* for purposes of choice of penalty. Section 190.3, subdivision (a), expressly suggests the contrary by directing the penalty jury to consider all the "circumstances" of the capital crime as well as the "existence of *any* special circumstances . . . ." (Italics added.)

Nor can section 190.3 be read in harmony with section 654. The Legislature clearly contemplated that the individual circumstances of the capital offense—including lesser offenses committed in connection therewith—be relevant to the ultimate punishment to be imposed. As noted above, burglary and robbery invade separate societal interests, and could thus legitimately be singled out in the statute for separate aggravating treatment. We therefore conclude that section 654 does not preclude a capital penalty jury from considering that the murder was committed in the course of both a robbery and a burglary.

Of course the robbery and the burglary may not each be weighed in the penalty determination *more than once* for exactly the same purpose. The literal language of subdivision (a) presents a theoretical problem in this respect, since it tells the penalty jury to consider the "circumstances" of the capital crime *and* any attendant statutory "special circumstances." Since the latter are a subset of the former, a jury given no clarifying instructions might conceivably double-count any "circumstances" which were also "special circumstances." On defendant's request, the trial court should admonish the jury not to do so.

However, the possibility of actual prejudice seems remote, and we are persuaded that it was not realized here. As discussed above, the jury was

---

[29] For this reason, the dissent's premise that use of both the robbery and the burglary as aggravating factors constitutes a form of "double punishment" proscribed by section 654 must fail at the outset.

fully aware of the facts of the DeSousa homicide and could validly consider them in deciding penalty. Exercising common sense, it was unlikely to believe it should "weigh" each special circumstance twice on the penalty "scale." The prosecutor did not exploit any ambiguity; his argument on "factor 'A' " simply emphasized the brutal and callous nature of the crimes against DeSousa. We find no grounds for reversal.

### K. Instruction that absence of mitigating factor is not "necessarily" aggravating factor.

At the penalty phase, defendant offered an instruction that "[t]he absence of a statutory mitigating factor does not constitute an aggravating factor." The court modified the instruction by inserting the word "necessarily" between "not" and "constitute."

As defendant notes, we have held that the mere absence of evidence of a statutory mitigating factor is not itself a factor in aggravation. (*Rodriguez, supra,* 42 Cal.3d at pp. 789-790; *Davenport, supra,* 41 Cal.3d at p. 289 [plur. opn.].) Defendant's proffered instruction was a correct statement of this principle. As modified, however, it suggested that while the jury was *not required* to find aggravation in the absence of a mitigating factor, it *could* do so. Such an implication is contrary to *Rodriguez* and *Davenport,* both *supra.*

Under all the circumstances, however, the jury could not have been misled. The instructions as a whole made clear that aggravating factors were strictly limited by statute, must be proved beyond a reasonable doubt, and should be considered only "if applicable." On the other hand, the instructions specified that the mitigating factors the jurors could consider "in deciding not to impose a death sentence" were "unlimited," that "fairness and mercy" were relevant, that the jury could assign any "weights" it deemed appropriate to the various factors, and that a single mitigating factor could outweigh all aggravating factors in the life-death balance.

As we have noted, these instructions gave the correct impression that the death penalty should not be imposed if the jury believed by its own standards that the evidence did not warrant that punishment. A jury properly advised about the broad scope of its sentencing discretion is unlikely to conclude that the *absence* of such unusual factors as "extreme" emotional disturbance, victim consent, or reasonable belief in moral justification (§ 190.3, subds. (d), (e), (f); see *Davenport, supra,* 41 Cal.3d at p. 289) is entitled to significant aggravating weight.

Moreover, the prosecutor did not exploit any inference in the modified instruction that the absence of a mitigating factor might be considered in

aggravation. He never argued that the absence of any category of mitigation *was itself* an aggravating factor. While he did note that several mitigating factors were *inapplicable,* we have indicated that this form of argument, if it stops there, is unobjectionable. (See *Rodriguez, supra; People* v. *Ghent* (1987) 43 Cal.3d 739, 771 [239 Cal.Rptr. 82, 739 P.2d 1250]; see also discussion, *post.*)

In context, we cannot believe the jury was misled by the challenged instruction. We see no basis for reversal of the penalty judgment.

*L. Refusal to delete instructional reference to mitigating factors not presented by evidence.*

■ During discussion of proposed penalty phase instructions, defense counsel argued that the instructions setting forth the statutory aggravating and mitigating factors should delete reference to any mitigating factors as to which no evidence had been presented. These included factors (e) (victim's participation or consent), (f) (defendant's belief in moral justification), (g) (extreme duress or domination by another), (i) (defendant's age), and (j) (defendant as mere accomplice or minor participant). The court refused to delete the "absent" mitigating factors.

Defendant renews his contention here, but, as our recent cases disclose, the trial court's action was proper. CALJIC No. 8.84.1 advises the jury to weigh a particular factor only "if applicable." Moreover, the jury's sentencing discretion is best guided by advising it "regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision." (*Gregg, supra,* 428 U.S. at p. 192.) So long as the absence of a particular factor is not considered a factor *in aggravation* (see discussion, *ante*), the jury is entitled to know that the crime lacks certain factors which, in the state's view, would make it a candidate for more lenient treatment than other offenses of the same general character. (See *Davenport, supra,* 41 Cal.3d at p. 289.) Thus, we have consistently held that instructional reference to "absent" mitigating factors is permissible. (*Miranda, supra,* 44 Cal.3d at pp. 104-105; *Ghent, supra,* 43 Cal.3d at pp. 776-777.) No error appears.

*M. Section 190.4 subdivision (e) motion.*

In a footnote, defendant urges the trial court applied incorrect standards when deciding the automatic post-trial motion for modification of the death verdict. (§ 190.4, subd. (e).) The claim stems from the court's suggestions that it could find no circumstances which extenuated the gravity of "the [capital] crime." Defendant interprets these comments to mean the trial

court did not understand its duty to consider all mitigating evidence presented by defendant, whether or not related to the capital offense.

We reject defendant's construction, however, since the court itself had expressly instructed the jury that mitigating factors were "unlimited." In context, the court's remarks imply only a finding "beyond all reasonable doubt" that defendant's proffered character and background evidence was outweighed by his "exceptionally aggravated" record of "great violence" and the "high . . . cruelty, callousness, and viciousness" of the DeSousa murder. No error appears.

*N. Proportionality review.*

Defendant concedes that the Eighth Amendment does not require this court to conduct "intercase" proportionality review—an examination whether imposition of the death penalty in his case was disproportionate to the penalties imposed on other persons who have committed similar offenses. (*Pulley, supra,* 465 U.S. at pp. 51-54 [79 L.Ed.2d at pp. 40-42].) However, he argues that state and federal proscriptions against "cruel" and "unusual" punishment require examination of "intracase" proportionality—i.e., whether the punishment is proportionate to his individual culpability, regardless of the punishment imposed on others. (E.g., *Enmund, supra,* 458 U.S. at p. 798 [73 L.Ed.2d at p. 1152]; *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-482 [194 Cal.Rptr. 390, 668 P.2d 697]; *In re Lynch* (1972) 8 Cal.3d 410, 423-424 [105 Cal.Rptr. 217, 503 P.2d 921].)

Here, defendant was convicted on extremely strong evidence of an intentional murder committed with exceptional brutality. The murder occurred in the course of a calculated plan to rob a victim specifically selected for his vulnerability. The evidence suggested that the victim's sexual proclivities were used as a device to exploit him and eliminate any possible resistance to defendant's criminal schemes. The crimes occurred in the victim's home, to which defendant had gained an invitation on false pretenses.

The sentencing jury was fully apprised of the numerous factors bearing on whether defendant was eligible for, and deserved, the death penalty. The penalty jury validly considered defendant's long history of violent criminality and felony offenses. His own evidence at the penalty phase suggested primarily that an already antisocial personality had been further hardened by years of incarceration. There was, of course, evidence that defendant was a cooperative prisoner and had sometimes exhibited kindness and concern to members of his family. But nothing in prior decisions of this court, or of

the federal courts, suggests that his punishment is constitutionally disproportionate to "the offense" or "the offender."

 Defendant also urges that capital defendants are denied *equal protection* unless they receive the benefits of the "disparate sentence" statute, section 1170, subdivision (f). We rejected the identical argument in *Allen, supra,* 42 Cal.3d at pages 1286-1288.

Finally, defendant contends that the death penalty is applied disproportionately against Black men who kill Whites. The record contains no evidence, direct or circumstantial, that race was a factor in the death sentence he received. (See *McCleskey* v. *Kemp* (1987) 481 U.S. 279 [95 L.Ed.2d 262, 107 S.Ct. 1756].)

## VI. CONCLUSION

We find no errors which, singly or in combination, caused prejudice warranting reversal of the guilt or penalty determinations. Accordingly, the judgment is affirmed in its entirety.

Lucas, C. J., Mosk, J., Panelli, J., Arguelles, J., and Kaufman, J., concurred.

**BROUSSARD, J.**—I concur in the judgment. I disagree, however, with language in the majority opinion which declares, contrary to the views we expressed in *People* v. *Harris* (1984) 36 Cal.3d 36, 65 [201 Cal.Rptr. 782, 679 P.2d 433], that two felonies arising from an indivisible course of conduct may be weighed as separate aggravating circumstances by the penalty jury.

In past cases this court has taken pains to construe the California death penalty statutes to avoid duplicative or overlapping aggravating factors because, as we said in *Harris,* the use of such factors "artificially inflates the particular circumstances of the crime and strays from the [United States Supreme Court's] mandate that the state 'tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.' (*Godfrey* v. *Georgia* (1980) 446 U.S. 420, at p. 428 [64 L.Ed.2d 398, at p. 406, 100 S.Ct. 1759].) The United States Supreme Court requires that the capital-sentencing procedure must be one that 'guides and focuses the jury's objective consideration of the particular circumstances of the individual offense and the individual offender before it can impose a sentence of death.' (*Jurek* v. *Texas* (1976) 428 U.S. 262, at pp. 273-274 [49 L.Ed.2d 929, 96 S.Ct. 2950].) That requirement is not met in a system where the jury considers the same act or an indivisible course of conduct to be more than one special circumstance." (36 Cal.3d at p. 63.)

For this reason the plurality opinion in *Harris* held that when a robbery and burglary arise out of an indivisible course of conduct, such that they could not be punished separately under Penal Code section 654, the two felonies should be considered as a single aggravating circumstance by the penalty jury. (36 Cal.3d at pp. 64-65.) Following the same policy, a majority of this court in *People* v. *Bigelow* (1984) 37 Cal.3d 731, 751 [209 Cal.Rptr. 328, 691 P.2d 994], narrowly construed the special circumstance of murder for financial gain to distinguish it from the special circumstances of felony murder. The recent decisions in *People* v. *Howard* (1988) 44 Cal.3d 375, 410 [243 Cal.Rptr. 842, 749 P.2d 279] and *People* v. *Kimble* (1988) 44 Cal. 3d 480, 506 [244 Cal.Rptr. 148, 749 P.2d 803] continue this policy. *Howard* adopts a broad view of the financial-gain special circumstances generally, but retains the narrower *Bigelow* construction (*supra,* 37 Cal.3d 731) to prevent duplicative aggravating circumstances whenever a defendant's conduct could otherwise be considered both felony murder and murder for financial gain. *Kimble,* following the reasoning of the plurality opinion in *Harris, supra,* 36 Cal.3d 36, construes factor (b) narrowly in order to "avoid the problem of artificially inflating aggravating circumstances." (*Ante,* pp. 505-506.) The majority opinion makes no reference to this established policy of construing the 1977 and 1978 death penalty statutes to avoid overlapping or duplicative factors.

The majority reject the guidance of Penal Code section 654, which bars multiple punishment for an indivisible course of conduct, on the ground that Penal Code section 190.3 is a more specific statute. I question this description; it is section 654, not 190.3, which specifically discusses the punishment of acts that violate more than one statute. In any case, a specific statute is assumed to operate in the context of the more general statute, and they are to be read together and harmonized. (*Bowland* v. *Municipal Court* (1976) 18 Cal.3d 479, 489 [134 Cal.Rptr. 630, 556 P.2d 1081].) The rule that a special statute controls over a more general one and constitutes an exception to the general rule only applies when the two statutes refer to the same subject matter and are inconsistent. (*People* v. *Gilbert* (1969) 1 Cal.3d 475, 479 [82 Cal.Rptr. 724, 462 P.2d 580]; *In re Williamson* (1954) 43 Cal.2d 651, 654 [276 P.2d 593]; *Pierce* v. *Riley* (1937) 21 Cal.App.2d 513, 518 [70 P.2d 206]; *Cohn* v. *Isensee* (1920) 45 Cal.App. 531, 536 [188 P. 279].) As always in statutory construction, the basic question is whether the Legislature intended the special statute to be an exception to the general rule. (See Code Civ. Proc., § 1859; *People* v. *Moroney* (1944) 24 Cal.2d 638, 643-644 [150 P.2d 888]; *People* v. *Hopkins* (1978) 78 Cal.App.3d 316, 319 [142 Cal.Rptr. 572].) I see absolutely no indication that the drafters of Penal Code section 190.3 intended to permit enhanced punishment for an indivisible course of conduct which happens to produce several special circumstance findings.

The majority assert that reconciliation of Penal Code sections 654 and 190.3 would frustrate the intent of the Legislature and voters to protect separate societal interests in the safety of the person and the safety of property. "Robbery involves an assaultive invasion of personal integrity; burglary an invasion of the sanctity of the home." (Maj. opn. *ante* at p. 768.) By enacting Penal Code section 654, however, the Legislature determined that a burglary and robbery which are part of an indivisible transaction can be punished only once. (See *People* v. *Smith* (1985) 163 Cal.App.3d 908, 912 [210 Cal.Rptr. 43], and cases cited; *People* v. *Lee* (1980) 110 Cal.App.3d 774, 784-785 [168 Cal.Rptr. 231]; *People* v. *Garrison* (1966) 246 Cal.App.2d 343, 356-357, cert. den. 389 U.S. 915 [54 Cal.Rptr. 731].) In other words, when Penal Code section 190.3 was enacted, the Legislature had already determined that the separate societal interests protected by the burglary and robbery statutes do not warrant increased punishment when the two crimes are part of an indivisible transaction. The majority cite no reason nor legislative history to show that the voters entertained a different view when they enacted Penal Code section 190.3.

In summary, I believe we should adhere to the policy of prior decisions and interpret Penal Code section 190.3 to avoid duplicative aggravating factors derived from a single, indivisible course of conduct. I therefore conclude that the trial court erred in not instructing the jury that the special circumstance of felony murder based on robbery and that of felony murder based on burglary, if derived from an indivisible course of conduct, could not each be considered as distinct aggravating factors. But since there appears to be no reasonable possibility that this error affected the result, I join in the affirmance of the penalty verdict.

Appellant's petition for a rehearing was denied May 26, 1988, and the opinion was modified to read as printed above.