Filed 9/3/15  P. v. Wilson CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JARROD JAMES WILSON,<br><br>    Defendant and Appellant. | F068716<br><br>(Super. Ct. No. 1427140)<br><br>**OPINION** |

-ooOoo-

**THE COURT**<sup>*</sup>

APPEAL from a judgment of the Superior Court of Stanislaus County.  Linda A. McFadden, Judge.

Thomas M. Singman, under appointment by the Court of Appeal, for Defendant Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Wanda Hill Rouzan, Deputy Attorneys General for Plaintiff and Respondent.

-ooOoo-

---

<sup>*</sup>        Before Kane, Acting P.J., Detjen, J. and Franson, J.

A jury convicted appellant Jarrod James Wilson of first degree burglary (count 1/Pen. Code, §§ 459, 460, subd. (a))[1] and second degree burglary (count 2/§§ 459, 460, subd. (b)).  In a separate proceeding, Wilson admitted two prior serious felony convictions (§ 667, subd. (a)), four prior prison term enhancements (§ 667.5, subd. (b)), and allegations that he had two prior convictions within the meaning of the three strikes law (§ 667, subds. (b)-(i)).

On appeal, Wilson contends the court abused its discretion when it denied his motion for a mistrial.  We affirm.

## FACTS

Dawn Nahhas's parents lived on Rumble Street in Modesto.  On November 6, 2010, Nahhas was watching their house while they were out of town.  At approximately 3:30 p.m., she drove by the house and noticed a Honda Civic parked in the driveway with a woman in the passenger's seat.  As she looked at the home's front courtyard, she saw a man standing at the front door knocking and glancing back.  Nahhas drove around the block and as she again approached her parents' house she saw that the Honda was now parked across the street from the house.  Suddenly, a man jumped out of the driver's seat of the car and ran directly in front of her car.  Nahhas slowed and watched the man in her rear view mirror go to the right of her parents' driveway and disappear.

Nahhas got a good look at the man when she initially saw him at the front door of her parents' house looking around and when he ran in front of her car.  Nahhas called her husband, Adam Boynton, explained that she thought someone was breaking into her parents' house, and told him to go there.  She then drove around the block again, pulled up behind the Honda, and entered the license plate number "into the notes" in her cell phone.  Boynton soon arrived and entered the house with a key, which set off a home

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

alarm. Inside, he encountered a man wearing latex gloves and holding a pillowcase. Boynton yelled at the man asking him what he was doing there. The man yelled back that he would kill Boynton and he ran past him out to the Honda and drove off. Nahhas followed him in her car but soon lost him.

$20,000 in jewelry and an expensive handbag were taken during the burglary. At approximately 4:45 p.m., Wilson pawned the jewelry at a pawnshop for $382. As part of the transaction, Wilson filled out a pawn slip and he provided the shop with a copy of his driver's license and a fingerprint.

On December 8, 2010, when presented with a photo lineup, Nahhas immediately identified Wilson as the man she saw at her parents' house. Nahhas stated she was 90 percent sure of her identification. Boynton was also shown the lineup and within 30 seconds he identified Wilson as the man he encountered at the house. Boynton was 70 percent sure of his identification.

Jeremy Gress testified for the defense. Gress claimed he met Wilson in 2007. However, he barely knew Wilson and they never hung out or did anything together, although they did once attend the same party and Gress occasionally saw Wilson on the street. According to Gress, on November 6, 2010, he walked from downtown to the Sherwood Apartments to pick up a female friend who was a "tweaker" so they could walk back downtown to look for drugs. However, after coming across a house with newspapers out in front, he left his female friend on a corner and returned to the house to check it out. Nobody seemed to be home so Gress jumped over a fence and threw a small concrete turtle he got from the yard through the glass portion of some French doors. Gress went inside, down a hall and into a bedroom where he found some jewelry in some drawers and put it in a pillowcase. Gress did not want to walk out of the house with a pillowcase over his shoulder so he stuffed some jewelry in his pocket and left the pillowcase and a radio in the hall.

3.

After leaving the residence, Gress joined his female friend on the corner and they walked to a park located across the street. Gress saw Wilson talking to a woman at the park approximately two houses down the street from the house he broke into. Gress walked up to Wilson, told him he was trying to get a friend home quickly, and he asked Wilson to let him borrow his mother's car for 40 minutes at the most. Wilson hesitated but allowed him to use the car. Gress drove with his friend down the street back to the house and parked in the driveway. After knocking to see if anyone was home, he got back into the car and parked it across the street. Gress then put on some latex gloves, climbed back over the fence, and went back into the house. As Gress got the pillowcase and radio he had left behind, he heard the door open and a man yell at him to get out of there. Gress replied, "You want a piece of this" and ran out of the door to the car. Gress drove off and dropped off his friend with the stolen property a couple of blocks away because he did not want to share his drugs with her. He drove around the block a few times before driving to the other side of the park, parking the car, and walking to Wilson's location.

As the two men walked to the car, Gress asked Wilson for a ride to a Denny's restaurant. Gress also asked Wilson if he would pawn the jewelry Gress had stuffed in his pocket for him because Gress did not have any identification and he promised to give Wilson half of whatever he received because Gress only wanted $150. Wilson agreed and drove Gress to the restaurant. Gress waited there while Wilson went across the street to a pawnshop and pawned the jewelry. Wilson soon returned with $300. Gress offered Wilson $150 but Wilson did not accept the money. Gress did not have his friend pawn the jewelry for him because she was "just another tweaker chick that would just want to have the money."

In June 2013, Gress found out that Wilson got in trouble for the burglary Gress committed and later that month he spoke to a defense investigator. According to Gress, he testified for the defense because he was trying to get his life together and he did not

4.

think he could live with himself if he did not testify because it would eat at him for the rest of his life.

Gress was impeached with felony convictions for second degree burglary, being a felon in possession of ammunition, and stalking. He also acknowledged that he and Wilson had been housed in Unit E of the Public Safety Center earlier that year. However, he claimed they never communicated on the case because he was housed downstairs in the unit, Wilson was housed upstairs, and they had different day rooms.

## DISCUSSION

### *The Motion For a Mistrial*

During rebuttal, the prosecutor called Detective Ramirez. During Ramirez's rebuttal testimony the following exchange occurred:

> "[THE PROSECUTOR]: [¶] … [¶] Q. Having heard the testimony of the defense witness, Jeremy Gress, and you read the statement as well as the defense investigator, has your belief changed that the defendant committed this burglary?
>
> "[DEFENSE COUNSEL]: Objection, your Honor, ultimate issue.
>
> "THE COURT : Sustained.
>
> "[THE PROSECUTOR]: Q. Based on your information and belief, does the testimony you heard change the facts of your affidavit that you prepared in support of the arrest warrant on this case?
>
> "[DEFENSE COUNSEL]: Objection; relevance.
>
> "THE COURT: Sustained.
>
> "[THE PROSECUTOR]: Q. Based on what you heard, do you feel that you need to do further investigation in this case?
>
> "A. No, I do not."

During the prosecutor's final closing argument the following exchange occurred:

"[PROSECUTOR]: [¶] … [¶] In addition, we heard the detective [say] that after listening to what Gress had to say he wouldn't have changed the result of [his] investigation.

"[DEFENSE COUNSEL]: Objection, your Honor, improper argument.

"THE COURT: Sustained."

After the jury began deliberations, defense counsel moved for a mistrial based on the prosecutor's first two questions to Detective Ramirez that the court sustained objections to and the prosecutor's argument that Gress's testimony would not have changed the result of the detective's investigation. In denying the motion, the court found that the prosecutor's comments were harmless in light of the evidence in the case and because the court sustained defense counsel's objections to these comments and admonished the jury to "disregard any answers or statements made after objections."

Wilson contends the court abused its discretion when it denied his motion for a mistrial because the three questions by the prosecutor quoted above and the portion of the prosecutor's argument he complains of, in effect, placed before the jury the police officer's opinion that Wilson was guilty and that a key defense witness was lying. We disagree.

"'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'" (*People v. Collins* (2010) 49 Cal.4th 175, 198.) We review the trial court's denial of a motion for a mistrial under the deferential abuse of discretion standard. (*People v. Williams* (1997) 16 Cal.4th 153, 210.) "'Under ordinary circumstances the trial court is permitted to correct an error in admitting improper evidence by ordering it stricken from the record and admonishing the jury to disregard it, and the jury is presumed to obey the instruction.'" (*People v. Gurrola* (1963) 218 Cal.App.2d 349, 357.)

6.

"'A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] "Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.""" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)

Further, the California Supreme Court has recognized that a lay witness's opinion about the veracity of another person's particular statements is *inadmissible* and *irrelevant* on the issue of the statement's credibility. (*People v. Melton* (1988) 44 Cal.3d 713, 744.)

Asking clearly improper questions constitutes misconduct. (*People v. Zambrano* (2004) 124 Cal.App.4th 228, 242.) Thus, it was misconduct for the prosecutor to ask Detective Ramirez the two questions that were objected to because they attempted to elicit, directly or by implication, his opinions that Wilson was guilty and that Gress did not testify truthfully. It was also misconduct for the prosecutor to refer to Ramirez's answer to one of these questions during closing argument. However, we are not persuaded that the question that was not objected to by defense counsel was improper.

"A defendant's conviction will not be reversed for prosecutorial misconduct unless it is reasonably probable that the jury would have reached a result more favorable to the defendant had the misconduct not occurred." (*People v. Zambrano*, *supra*, 124 Cal.App.4th at p. 243.)

The court sustained defense counsel's objections to the prosecutor's improper questions and to his improper argument. Additionally, the court instructed the jury that they alone were to judge the credibility of witnesses, that none of the attorneys' remarks during opening statements or closing arguments were evidence, and that if the court sustained an objection, they were to ignore the question. Nothing in the record suggests that the jury was likely to disregard the court's instructions. Further, the jury learning of Detective Ramirez's opinions that Wilson was guilty and that Gress testified untruthfully could not have influenced their verdict because as the investigating officer, Ramirez's

opinions in that regard were not surprising, especially in light of the overwhelming evidence of Wilson's guilt, as discussed below. (Cf. *People v. Riggs* (2008) 44 Cal.4th 248, 300-301.)

"Possession of recently stolen property is so incriminating that to warrant conviction [for burglary] there need only be, in addition to possession, slight corroboration in the form of statements or conduct of the defendant tending to show his guilt." (*People v. McFarland* (1962) 58 Cal.2d 748, 754.) "'[Possession] of stolen property, accompanied by no explanation, or an unsatisfactory explanation of the possession, or by suspicious circumstances, will justify an inference that the goods were received with knowledge that they had been stolen. The rule is generally applied where the accused is found in possession of the articles soon after they were stolen.'" (*Ibid*.)

During the trial, the court instructed the jury as follows:

> "If you conclude that the defendant knew he possessed property and you conclude that the property had, in fact, been recently stolen, you may not convict the defendant of residential burglary in the first degree based on those facts alone.

> "However, if you also find that supporting evidence tends to prove his guilt, then you may conclude that the evidence is sufficient to prove he committed residential burglary in the first degree. *The supporting evidence need only be slight and need not be enough by itself to prove guilt.*

> "You may consider … how, where, and when the defendant possessed the property along with other relevant circumstances tending to prove his guilt of residential burglary in the first degree.…" (Italics added.)

It was undisputed that Wilson possessed stolen jewelry when he pawned it less than two hours after it was stolen during the burglary of the house belonging to Nahhas's parents. Further, the record contains strong evidence that corroborates the inference from Wilson's possession of the recently stolen jewelry that he was the burglar. Nahhas was able to get a good look at the man who broke into her parents' house while he knocked on the door to see if anyone was home and again when he ran in front of her car. Nahhas

testified she was 90 percent certain of her identification of Wilson as the man who she saw at her parents' house. Boynton was able to view the burglar's face and presumably got a good view of it when he confronted the burglar just before the burglar ran past him while escaping from the house. Boynton was later able to select Wilson as the burglar from a photo lineup and he told the detective that he was 70 percent certain of his identification. Additionally, it was undisputed Wilson had his mother's car in his possession on the day of the burglary and that her car was used during the burglary.

Gress, the only defense witness, was impeached with three prior felony convictions and much of his testimony strained credulity, did not make sense, or was contradictory. For example, he claimed that even though he barely knew Wilson, Wilson lent him a car belonging to his mother so Gress could give his friend a ride. According to Gress, he blatantly lied to Wilson about giving his friend a ride even though Gress knew Wilson likely would see him drive the car only a few houses down the street to the house where the burglary occurred. Gress's testimony that he walked to his friend's house to get her so they could go get drugs contradicted his subsequent testimony that he dropped her off because he did not want to share his drugs with her. Gress's reason for not asking his friend to pawn the jewelry also did not make sense. He claimed he did not have his friend pawn the jewelry because she was a "tweaker" and would have wanted the money, yet he dropped her off with a pillowcase containing the remainder of the $20,000 worth of jewelry taken during the burglary that he did not stuff in his pocket.

Moreover, Wilson undoubtedly would have surmised that the jewelry he pawned was stolen if, as Gress claimed, Gress pulled out jewelry that was stuffed in his pocket, asked Wilson to pawn it because he did not have identification, and told him he only wanted $150 of the proceeds. Further, since the pawned jewelry would be traceable back to Wilson through his driver's license and fingerprint, it defies common sense that Wilson would knowingly commit a criminal offense for a man he barely knew for no compensation.

9.

Wilson contends that Gress's testimony was "convincing" because it matched up with many of the details of the burglary. Therefore, according to Wilson, it is likely he would have received a more favorable result if the prosecutor had not elicited the improper opinion testimony from Detective Ramirez. This contention, however, ignores the problems with Gress's testimony discussed above. Further, Gress had been in custody since February 2013, at the Public Safety Center in Unit E, the same unit where Wilson had been in custody and could have discussed the details of the burglary with Wilson during that time. Gress denied that he could have communicated with Wilson because, according to Gress, he was housed in the downstairs part of the unit and Wilson was in the upstairs and they had different day rooms. However, defense counsel did not provide any evidence to corroborate Gress's assertion that he could not communicate with Wilson and Gress's credibility was undermined by his prior convictions and the problems with his testimony discussed above.

During deliberations the jury requested to see a copy of a letter Gress sent to defense counsel allegedly confessing his involvement in the burglary. The court denied the request because Gress's letter was mentioned during the trial but not introduced into evidence. Wilson contends that this request may indicate that the case was a close one. We disagree.

The jury deliberated less than two hours and its ability to reach a decision in such a short time indicates it did not have any difficulty in reaching its verdict. In any case, any inference that the case was close that can be derived from the jury's request for Gress's letter was amply dispelled by the overwhelming evidence of guilt discussed above. In denying Wilson's motion for a mistrial, the court implicitly found it was not reasonably probable Wilson would have received a more favorable result absent the prosecutorial misconduct. Since this finding is amply supported by the record, we

10.

conclude that the court did not abuse its discretion when it denied Wilson's motion for a mistrial.[2]

## **DISPOSITION**

The judgment is affirmed.

---

[2] Wilson contends he was denied the effective assistance of counsel if he forfeited any issue on appeal by defense counsel's failure to object. This contention is moot because we addressed the merits of all the issues Wilson raises.